J-A22025-23
J-A22026-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| AXIALL CORPORATION | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ALLTRANSTEK LLC, RESCAR, INC. | : | |
| T/B/D/A RESCAR COMPANIES AND | : | |
| SUPERHEAT FGH SERVICES, INC. | : | No. 966 WDA 2022 |
| | : | |
| | : | |
| APPEAL OF: ALLTRANSTEK LLC AND | : | |
| RESCAR, INC., T/B/D/A RESCAR | : | |
| COMPANIES | : | |

Appeal from the Judgment Entered August 10, 2022
In the Court of Common Pleas of Allegheny County Civil Division at
No(s): GD-18-010944

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| AXIALL CORPORATION | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ALLTRANSTEK LLC; RESCAR, INC., | : | No. 1016 WDA 2022 |
| T/B/D/A RESCAR COMPANIES; | : | |
| SUPERHEAT FGH SERVICES, INC | : | |

Appeal from the Judgment Entered August 10, 2022
In the Court of Common Pleas of Allegheny County Civil Division at
No(s): GD-18-010944

BEFORE: BOWES, J., OLSON, J., and KING, J.

MEMORANDUM BY OLSON, J.: **FILED: JUNE 3, 2024**

In this cross-appeal,[1] AllTranstek LLC ("AllTranstek") and Rescar, Inc. t/b/d/a Rescar Companies ("Rescar") appeal from the August 10, 2022 judgment entered in the Court of Common Pleas of Allegheny County upon a jury verdict in favor of Axiall Corporation ("Axiall"), and against AllTranstek and Rescar. On cross-appeal, Axiall also appeals from the August 10, 2022 judgment, challenging the jury verdict in favor of Superheat FGH Services, Inc. ("Superheat"). In the appeal filed by AllTranstek and Rescar (966 WDA 2022), we affirm the judgment, in part, and vacate the portion of the judgment awarding attorney's fees in the amount of $8,324,073.25, and we remand this case for further proceedings in accordance with this memorandum. In the cross-appeal (1016 WDA 2022), we dismiss Axiall's cross-appeal as moot.

The trial court summarized the factual history as follows:

Axiall owns and operates [a] 564-acre facility [] in Natrium, West Virginia ("the Natrium Plant"), where it manufactures chlorine and other products. The chlorine manufactured at the Natrium Plant is transported exclusively by railroad [tank] car and barge, for which purpose Axiall owns and operates a fleet of railroad tank cars. The Natrium Plant was previously owned and operated by PPG Industries, Inc. ("PPG"), until [a business unit of] PPG merged with Georgia Gulf Corporation [("Georgia Gulf")] in 2013 to create Axiall. AllTranstek and Rescar [] performed work for PPG prior to the formation of Axiall. In late August [] 2016, Axiall was acquired by Westlake [Corporation].

AllTranstek provides railroad tank car fleet management services, including the monitoring of fleet movement, ensuring equipment

---

[1] For decisional purposes, we *sua sponte* consolidate the appeals filed with this Court at dockets 966 WDA 2022 and 1016 WDA 2022.

condition, managing regulatory requirements, and auditing repair and mileage activity. AllTranstek provided these services to PPG and continued to do so under year-to-year "contracts" with Axiall. These contracts came in the form of purchase orders, which the jury found to incorporate by reference Axiall's Purchase Order General Conditions ("Terms and Conditions"). Under these contracts, Axiall retained AllTranstek to manage the inspection and maintenance of Axiall's fleet of [railroad tank cars]. Axiall relied upon AllTranstek's expertise and knowledge of the regulatory landscape that governed [railroad tank car] maintenance. Rescar provides railroad tank car maintenance services including, among other things, mechanical repair, exterior painting, interior coating, and cleaning. As with AllTranstek, Axiall contracted with Rescar to provide these maintenance services using similar purchase orders that incorporated Axiall's Terms [and] Conditions.

The railroad tank car at issue in this case, AXLX 1702, was built [] in June 1979, [] and is a DOT 105A500W pressure [railroad] tank car[.[2] AXLX 1702, in this case,] was constructed of non-normalized steel and equipped with an ACF200 stub sill underframe. Non-normalized steel was commonly used in constructing [railroad] tank cars, such as AXLX 1702, prior to 1982. Axiall and PPG used AXLX 1702 to transport chlorine from 1979 until 2013 when a division of PPG was "spun off" and merged with Georgia Gulf to form Axiall. AXLX 1702 was requalified per federal regulations for the first time in 2000 by Millennium Rail[, Inc.]

There was significant argument and expert testimony at trial surrounding the reasonableness of Axiall's continued use of AXLX 1702 in light of its non[-]normalized steel [construction] and [ACF200] stub sill underframe. In 2006, the Federal Railroad Administration ("FRA") promulgated a Safety Advisory and Corresponding Maintenance Bulletin TC-200 with regard to the use

---

[2] The United States Department of Transportation ("DOT") employs a classification system for railroad tank cars that indicates the type of chemical or liquid the railroad tank car is authorized to transport. In this instance, a designation of "DOT 105A500W" indicates that the railroad tank car is a pressurized tank car with top and bottom shelf couplers, with a test pressure of 500 pounds per square inch ("PSI"), and, currently, would be constructed using carbon steel and fusion welding. 49 C.F.R. §§ 179.100 to 179.103-5.

of [railroad tank] cars equipped with ACF200 underframes (the "2006 Safety Advisory"). In April [] 2017, months after the incident in question, the Association of American Railroads ("AAR") promulgated a rule that phased out the use of non-normalized steel [railroad tank] cars for transporting toxic inhalation hazards, such as chlorine gas. [AllTranstek and Rescar] attempted to prove at trial that Axiall was aware, even before the promulgated rule, of the issues with non-normalized steel [railroad tank] cars and that such [railroad tank] cars were no longer manufactured for those reasons. Additionally, evidence presented at trial showed that Axiall was aware of the 2006 Safety Advisory and that many of [its railroad] tank cars may have had cracks around their stub sill [under]frames. Thus, [AllTranstek and Rescar] attempted to show at trial that Axiall's knowledge of these potential defects in a [railroad tank] car like AXLX 1702, [together with Axiall's failure to take remedial action], established Axiall's contributory negligence in the ultimate rupture of the [railroad] tank [car]. The jury ultimately apportioned 40% of fault to Axiall.

In 2010, Rescar performed a federally required ten-year qualification inspection on AXLX 1702. The [railroad tank] car was then shipped straight from [Rescar's inspection facility] to Texana Tank to be re-jacketed in 2010. Texana Tank did other work on AXLX 1702, including post[-]weld heat treatment. In February [] 2016, AXLX 1702 was sent to Rescar's DuBois[, Pennsylvania] facility for a five-year interim inspection required on chlorine tank cars in accordance with Axiall's maintenance manual and Axiall's [shipping] instructions. Rescar's work included cleaning, thickness testing, build-up welding for corrosion repair, post-weld heat treatment, and hardness testing. The interior inspection of AXLX 1702, performed by Rescar[ at its Dubois facility], revealed many corroded areas on the interior of the tank shell that fell below Axiall's minimum tank shell thickness requirements. Due to the extensive nature of the repairs, a repair estimate of approximately $58,000[.00] was provided to Axiall for approval.

After Axiall[ approved] the repairs to AXLX 1702, Rescar employees repaired the corroded areas on the interior of the tank shell by welding in May [] 2016. After weld repairs [were performed], and consistent with the applicable procedures and regulations, local post-weld heat treatment was performed. [Local post-weld heat treatment] is performed after welding is completed on a [railroad tank car] in an effort to reduce and redistribute the residual stresses present in the steel after

welding. The process involves placing ceramic fiber heating pads on the areas of the tank shell where weld repairs were performed in order to heat the metal [] to a particular temperature, hold that temperature for three hours, and then control the [cooling] of the metal. Thermocouples must be centered under each heating element to monitor the temperatures reached during [local post-weld heat treatment.] Insulation is placed on the opposite side of the tank shell during the process.

Prior to the [local post-weld heat treatment performed] on AXLX 1702 [] in 2016, Rescar entered into a contract with Superheat whereby Superheat provided certain [local post-weld heat treatment] equipment to Rescar and remotely monitored the temperatures reached during the [local post-weld heat treatment] process from its facility located in Kincardine, Ontario[, Canada]. The [local post-weld heat treatment] of AXLX 1702 in 2016 occurred on six dates in late May and early June. Superheat's function was to monitor the temperatures and [local post-weld heat treatment] equipment power outputs during [local post-weld heat treatment] and advise Rescar['s] technicians of potential issues evident through the monitoring of this data. While Rescar was responsible for most of the maintenance work, Superheat was responsible for monitoring the [local post-weld heat treatment] of the railroad tank car, and AllTranstek was responsible for inspecting the work [upon completion]. While Axiall alleged that Superheat negligently failed to perform a successful [monitoring of the local post-weld heat treatment], the jury found no liability on the part of Superheat. Axiall also alleged that the AllTranstek inspector assigned to [] Rescar['s] DuBois facility[] failed to conduct any in-process inspections in connection with the work performed on AXLX 1702.

On July 20, 2016, [the AllTranstek inspector] performed a final inspection of AXLX 1702 and declared [the railroad tank car] fit for return to chlorine [transport] service. This final inspection included a review of the [railroad tank] car file associated with AXLX 1702 indicating that it is constructed of non-normalized steel and is equipped with an ACF200 stub sill [underframe]. The inspection failed to include an interior inspection [of the tank] and a stub sill [underframe] inspection. [Rescar] argued at trial that the purpose of this five-year inspection was principally to conduct a cleaning inspection of the interior [of the railroad tank car], rather than a federal qualification inspection in which the stub sill [underframe] would have been inspected.

On August 27, 2016, AXLX 1702 was loaded with liquid chlorine at the Natrium [Plant] for the first time after the maintenance work performed by Rescar and Superheat. Shortly thereafter, the tank ruptured, causing a pre-existing crack to widen and rupture, out of which escaped more than 178,000 pounds of liquid chlorine into the atmosphere. The liquid chlorine vaporized and formed a plume of chlorine gas that spread across much of Axiall's Natrium chloralkali plant in Proctor, West Virginia, as well as neighboring properties. There were only minor injuries to some employees who were exposed at the time of the release.

Axiall filed its complaint [against AllTranstek, Rescar, and Superheat] on August 24, 2018. In addition to [causing] lawsuits [to be filed by third parties] against Axiall for the damage to [neighboring] properties, Axiall claimed that the rupture and leakage caused hundreds of millions of dollars of damage to its own property. Axiall alleged that both AllTranstek and Rescar agreed to and breached Axiall's [T]erms and [C]onditions by failing to properly perform their respective work and inspect the same. Additionally, Axiall alleged that AllTranstek and Rescar were negligent in their respective work on AXLX 1702. A National Transportation Safety Board ("NTSB") inspection after the incident concluded that the probable cause [of the railroad tank car rupture and ensuing leak] was an undetected, subsurface, pre-existing crack near the inboard end of the stub sill cradle pad.

This case was ultimately tried by [a] jury for approximately six weeks. . . . The jury ultimately returned a verdict on October 18, 2021, in favor of Axiall on its contract and tort claims. Specifically, on Axiall's claim for negligence, the jury apportioned 40% fault to Axiall contributorily, 20% [fault] to AllTranstek, 40% [fault] to Rescar, and 0% [fault] to Superheat. The jury awarded [$12,800,000.00] in damages.

Trial Court Opinion, 12/21/22, at 2-7 (extraneous capitalization omitted).

On October 25, 2021, AllTranstek and Rescar jointly filed a motion for post-trial relief, requesting, *inter alia*, that the trial court enter judgment *non-obstante veredicto*, or, alternatively, "remit the verdict to an amount commensurate with the damages[.]" AllTranstek and Rescar Post-Trial

- 6 -

Motion, 10/25/21, at 3-23. The post-trial motion also included a motion to mold the verdict to the amount of $7,680,000.00, which, according to AllTranstek and Rescar, reflected the amount of factual cause attributed by the jury to both AllTranstek and Rescar, combined. *Id.* at 23. That same day, Axiall filed a motion to mold the verdict, requesting, *inter alia*, that the trial court "find any casual negligence attributed to [Axiall] by the jury does not reduce the verdict awarded to it" on its breach of contract and breach of warranty claims. Axiall Post-Trial Motion, 10/25/21, at 7-8.

On November 3, 2021, Axiall filed a second motion for post-trial relief, seeking a new trial, or, alternatively, judgment *non-obstante veredicto*. Axiall Post-Trial Motion, 11/3/21. In its motion for a new trial, Axiall asserted that the trial court improperly admitted evidence related to non-normalized steel, ACF200 stub sill underframes, remedial actions by Axiall, and post-rupture changes to regulations and industry guidance, as well as testimony from AllTranstek's and Rescar's expert. *Id.* at 2-6. Axiall requested judgment *non-obstante veredicto* on the contributory negligence claims forwarded by AllTranstek, Rescar, and Superheat on grounds that the defendant-parties failed to establish that Axiall was contributorily negligent in the cause of the AXLX 1702 rupture. *Id.* at 6-7. That same day, Superheat filed a post-trial motion, requesting that, in the event the trial court were to grant a new trial, the trial court should enter judgment in favor of Superheat as a matter of law, on the grounds the jury found in favor of Superheat concerning Axiall's

negligence claim against Superheat. Superheat Post-Trial Motion, 11/3/21, at 3-9 (unpaginated).

On November 12, 2021, AllTranstek and Rescar jointly filed a motion to strike Axiall's motion for post-trial relief, together with a joint response in opposition to Axiall's motion to mold the verdict. On November 17, 2021, Superheat filed a motion to strike, or, alternatively, to deny, Axiall's motion for post-trial relief. Axiall filed an *omnibus* response in opposition to the motions to strike on November 29, 2021.

After the submission of briefs supporting and opposing the pending post-trial motions, the trial court, on February 16, 2022, denied Axiall's request for a new trial and entry of judgment *non-obstante veredicto*. Trial Court Order, 2/16/22, at ¶1. In that same order, the trial court granted Axiall's motion for entry of judgment against AllTranstek and Rescar, declaring that both parties are contractually bound to indemnify, defend, and hold Axiall harmless from all damages; granted Axiall's motion to enter an unreduced verdict of $12,800,000.00 based upon the jury's finding in favor of Axiall on its breach of contract and breach of warranty claims; granted Axiall's request for delay damages from August 24, 2019, to October 14, 2021, calculated at the statutory rate of six *per cent per annum* on 60% of the full verdict, reduced in accordance with the suspension of such calculations due to the COVID-19 global pandemic; granted Axiall's request for post-judgment interest from October 14, 2021, to the date payment is effectuated; granted Axiall's request for attorney's fees, costs, and expenses, the amount of which was to be

determined at a future evidentiary hearing; and denied Axiall's request for pre-judgment interest. *Id.* at ¶¶2-3. In a separate order, entered on February 16, 2022, the trial court denied the motions for post-trial relief filed by AllTranstek and Rescar (jointly), as well as Superheat.

On February 25, 2022, Superheat filed a *praecipe* for entry of judgment in favor of Superheat and against Axiall. Judgment in favor of Superheat, and against Axiall, in the amount of $0.00 was entered that same day. On March 9, 2022, Axiall filed an emergency motion to strike the judgment entered in favor of Superheat. On Monday, March 28, 2022, Axiall filed a timely notice of appeal, which was docketed by this Court at 484 WDA 2022, from the February 25, 2022 judgment entered in favor of Superheat.[3] On June 9, 2022, this Court, in a *per curiam* order, quashed Axiall's appeal without prejudice to seek a new appeal once final judgment was entered as to all claims.[4] *Per Curiam* Order, 6/9/22 (484 WDA 2022).

_____

[3] *See* Pa.R.A.P. 903(a) (requiring notice of appeal to be filed within 30 days after entry of order from which appeal is taken); *see also* 1 Pa.C.S.A. § 1908 (stating that, whenever the last day of any period of time referred to in a statute "shall fall on Saturday or Sunday, or on any day made a legal holiday by the laws of this Commonwealth or of the United States, such day shall be omitted from the computation").

[4] The entry of judgment as to one party, but fewer than all parties is not a final judgment from which an appeal may be taken. *See Gutteridge v. A.P. Green Serv., Inc.*, 804 A.2d 643, 650 (Pa. Super. 2002), *appeal denied*, 829 A.2d 1158 (Pa. 2003); *see also* Pa.R.A.P. 341(a) and (b)(1) (stating that, a final order from which an appeal may be taken is an order that, *inter alia*, "disposes of all claims and all parties"). In the case *sub judice*, the entry of judgment on August 10, 2022, as to the remaining parties, AllTranstek and

Meanwhile, on April 12, 2022, Axiall filed a motion for reconsideration of the trial court's order reducing the award of delay damages in accordance with the suspension of such calculations due to the COVID-19 global pandemic. AllTranstek and Rescar jointly filed a response in opposition to Axiall's motion for reconsideration on May 9, 2022.

On August 8, 2022, the trial court awarded Axiall attorney's fees, costs, and expenses in the amount of $8,324,073.25. That same day, in a separate order, the trial court granted Axiall's motion for reconsideration and amended the award of delay damages such that the damages would be calculated from August 24, 2019, through October 14, 2021, at the statutory rate of six *per cent per annum* on 60% of the full verdict ($12,800,000.00) without reduction due to the COVID-19 global pandemic.

On August 10, 2022, upon *praecipe* for entry of judgment filed by Axiall, judgment was entered in favor of Axiall and against AllTranstek and Rescar in the amount of $22,589,524.71.[5] On August 23, 2022, AllTranstek and Rescar filed a joint notice of appeal, which was docketed by this Court at 966 WDA 2022. On August 30, 2022, Axiall filed a notice of cross-appeal,

_____

Rescar, resulted in a final, appealable judgment as to all parties, including Superheat.

[5] A break-down of the judgment is as follows:

| | |
|---|---|
| Verdict | $12,800,000.00 |
| Attorney's fees, costs, and expenses | $8,324,073.25 |
| Delay damages | $403,802.46 |
| Post-judgment interest (through 8/9/22) | $1,061,649.00 |

which was docketed by this Court at 1016 WDA 2022. AllTranstek and Rescar filed a concise statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(b) on September 13, 2022, and the trial court filed its corresponding Rule 1925(a) opinion on December 21, 2022. Axiall filed its Rule 1925(b) statement pertaining to the cross-appeal on September 20, 2022, and the trial court filed its Rule 1925(a) opinion pertaining to the cross-appeal on December 21, 2022.

AllTranstek and Rescar raise the following issues for our review:

1. Whether judgment [*non-obstante veredicto*] is required on Axiall's breach of contract and breach of warranty claims, where the unsigned purchase orders on which those claims are based contain explicit language requiring signature, and where the jury never found the purchase orders were the parties' contracts?

2. Whether judgment [*non-obstante veredicto*] is required on Axiall's breach of contract and breach of warranty claims, where the Terms and Conditions on which those claims are based were not validly incorporated by reference into Axiall's purchase orders, and where the jury's finding on the Terms and Conditions was contrary to law?

3. Whether vacatur of the judgment is required because the trial court committed legal error by treating the jury's general verdict as a "base verdict" allocable to every claim, and by refusing to reduce the verdict to reflect the jury's clear finding that Axiall caused 40% of its own harm?

4. Whether reversal of the declaratory judgment and fee award is required[] because the parties never clearly agreed to set aside the American Rule?

AllTranstek and Rescar Brief, at 7-8 (extraneous capitalization omitted).[6]

## ALLTRANSTEK AND RESCAR APPEAL

### Denial of Judgment *Non-Obstante Verdicto*

AllTranstek's and Rescar's first and second issues challenge the trial court's denial of judgment *non-obstante veredicto* on Axiall's breach of contract and breach of warranty claims. *Id.* at 23-52.

> We review the denial of a request for [judgment *non-obstante veredicto*] for an error of law that controlled the outcome of the case or an abuse of discretion. In this context, an abuse of discretion occurs if the trial court renders a judgment that is manifestly unreasonable, arbitrary[,] or capricious; that fails to apply the law; or that is motivated by partiality, prejudice, bias[,] or ill-will.
>
> When reviewing the denial of a request for [judgment *non-obstante veredicto*, an] appellate court examines the evidence in the light most favorable to the verdict winner. Thus, the grant of [judgment *non-obstante veredicto*] should only be entered in a clear case.
>
> There are two bases upon which a movant is entitled to [judgment *non-obstante veredicto*]: one, the movant is entitled to judgment as a matter of law, [or] two, the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. When an appellant challenges a jury's verdict on this latter basis, we will grant relief only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice.

---

[6] An *amicus curiae* brief was filed with this Court by the Pennsylvania Coalition for Civil Justice Reform in support of the appeal filed by AllTranstek and Rescar.

***Harley v. HealthSpark Found.***, 265 A.3d 674, 684 (Pa. Super. 2021) (citations, quotation marks, and original brackets omitted), *appeal denied*, 277 A.3d 1105 (Pa. 2022).

AllTranstek and Rescar assert that the trial court erred in denying their joint request for judgment *non-obstante veredicto* because Axiall's purchase orders did not form an enforceable contract and its Terms and Conditions were not validly incorporated into the purchase orders.[7] AllTranstek and Rescar Brief at 41, 52. Specifically, AllTranstek and Rescar contend that Axiall's purchase orders explicitly required a signature and the absence of the necessary signatures on the respective purchase orders prevented the writings from forming enforceable contracts. ***Id.*** at 25, 27-32 (stating, "the absence of the required signatures prevented the [purchase orders] from becoming contracts, leaving them at best unaccepted offers"). AllTranstek and Rescar further contend that Axiall's Terms and Conditions were not incorporated into the purchase orders because, *inter alia*, the "Terms and Conditions were not clearly identified" in the purchase orders and the purchase orders did not contain a "statement summarizing or even hinting at [the] contents [of the Terms and Conditions]." ***Id.*** at 45-49. AllTranstek and Rescar argue that the trial court, in denying the request for judgment

_____

[7] As discussed in greater detail *infra*, Axiall's practice was to forward purchase orders to vendors, such as AllTranstek and Rescar, when railroad tank car maintenance work was required. Axiall's standard purchase orders refer to "Terms and Conditions" that can be reviewed on Axiall's company website.

*non-obstante veredicto*, erred in relying on the Terms and Conditions to support the finding that AllTranstek and Rescar accepted the offers set forth in the purchase orders, thereby forming enforceable contracts. *Id.* at 35-41. AllTranstek and Rescar assert that because the Terms and Conditions were not expressly incorporated into the purchase orders, acceptance could only be manifested by a signature on the purchase order, and the absence of rejection by AllTranstek and Rescar of the purchase orders within 10 days of receipt or the undertaking of performance in accordance with the purchase orders could not be deemed, pursuant to the Terms and Conditions, as acceptance. *Id.* at 36.

In denying the motion for judgment *non-obstante veredicto*, the trial court explained,

> [AllTranstek's and Rescar's] first four errors complained of all sound in issues relevant to the breach of warranty and [breach of] contract claims and shall accordingly be addressed jointly. As an initial matter, [the trial] court gave proper and fair instructions to the jury regarding the parties' contracts.
>
> Those instructions, which were reviewed and agreed to by [AllTranstek, Rescar,] and Axiall, included the following:
>
>> Axiall and Rescar had a contract pursuant to which Rescar was to perform repair and maintenance services on some of Axiall's railroad tank cars, including AXLX 1702. Axiall and AllTranstek also had a contract pursuant to which AllTranstek was to assist in the management of Axiall's fleet of railroad tank cars, including AXLX 1702. The parties, however, disagree about what documents establish the contracts between the parties and what the terms of those contracts are. Where the terms of a contract are disputed, Axiall, as the party asserting breach of the contract, bears the burden of proving by a preponderance of the evidence

> that a contract was formed and what the terms of that contract are.
>
> Axiall's purchase orders reference but do not include its Terms and Conditions which are available on Axiall's website.
>
> Axiall claims that its purchase orders and its Terms and Conditions are a part of the parties' contracts. Rescar and AllTranstek both deny that the purchase orders and Axiall's Terms and Conditions are a part of its contracts with Rescar and AllTranstek.

Thus, as is evident from the above excerpts, the [trial] court merely presented complicated contractual and scientific issues to the jury in a digestible manner, but left the determination and resolution of those issues to the province of the fact[-]finder. In short, as the parties agreed, the jury was instructed that Axiall had contracts with Rescar and AllTranstek. The jury was also instructed that Axiall claimed that the contracts included its purchase orders and Terms and Conditions, and that [AllTranstek and Rescar] denied these claims. Finally, the jury instructions made clear that the jury was to determine whether [Axiall's] Terms and Conditions were incorporated by reference through [Axiall's] purchase orders [into the contractual agreements between the parties]. Thus, if [Axiall's] Terms and Conditions were part of the parties' contracts, so were [Axiall's] purchase orders. As [the trial] court instructed the jury, a finding that the Terms and Conditions are a part of the parties' contracts was *ipso facto* a finding that the purchase orders were a part of those contracts as well.

At trial, the jury was presented with more than sufficient evidence to support its finding that Axiall's purchase orders were issued to and received by [AllTranstek and Rescar]. In fact, ample evidence was derived from the [] Senior Vice President and General Counsel[ for AllTranstek and Rescar], Dan Madock. Specifically, the jury was presented with Mr. Madock's affidavit and deposition testimony, in which he admitted that [AllTranstek and Rescar] received Axiall's purchase orders, which expressly referenced Axiall's Terms and Conditions. In his affidavit, which was read to the jury and allowed into evidence, Mr. Madock admitted that the purchase orders were electronically transmitted to [AllTranstek and Rescar]. In addition, he admitted that the purchase orders referenced Axiall's Terms and Conditions and directed the

- 15 -

recipient to obtain a copy of those Terms and Conditions on Axiall's website. Similarly, in Mr. Madock's videotaped deposition testimony, which was played for the jury, he also admitted that Axiall [sent a facsimile of,] or [sent *via* electronic mail, a copy of, its] purchase orders to Rescar's invoicing department every year and that [Axiall's purchase orders] referenced Axiall's Terms and Conditions.

Also admitted into evidence were Axiall's Terms and Conditions, which provided how Axiall's purchase orders were to be accepted. There was no evidence admitted at trial to support a finding that either [AllTranstek or Rescar] rejected Axiall's purchase orders or Terms and Conditions. And there was ample evidence admitted at trial to support the jury's finding that [AllTranstek and Rescar] performed the work requested by the purchase orders. Based on that evidence, the jury found that Axiall's purchase orders were part of the parties' agreements.

As a final matter relevant to these [alleged] errors, the jury was properly instructed regarding causation and the respective breach of warranty and breach of contract claims. The jury specifically received the following instructions:

> In order for you to arrive at a verdict on Axiall's claims against AllTranstek, Rescar[,] and Superheat, you must resolve the following factual questions by a preponderance of the evidence. . . . Third, whether or not AllTranstek['s] and Rescar's breach of any warranty resulted in damage to Axiall. . . . Fifth, whether or not any breach of that contract by AllTranstek and Rescar caused damages to Axiall.

> And ninth, if you find a breach of warranty and/or breach of contract and/or negligence on the part of the defendants that resulted in the rupture of AXLX 1702, you must determine the appropriate measure of damages.

Thus, the instructions clearly allowed the jury to find a breach of either, or both, the [] warranty or [] contract[.] The jury's clear findings regarding these claims were supported by evidence of record - specifically, by the admissions of [Mr. Maddock], who admitted that (1) [AllTranstek and Rescar] received [Axiall's] purchase orders, and (2) that [Axiall's] purchase orders reference[d] Axiall's Terms and Conditions.

[The trial] court considered the facts in the light most favorable to Axiall and accepted as true all evidence which supported

> [Axiall's] contention that the purchase orders constituted the contracts between the parties. Additionally, and because [AllTranstek and Rescar] proffered little to no evidence adverse to this assertion, the [trial] court rightly decided not to disturb the jury's verdict pertinent to the same. In light of this evidence, [AllTranstek and Rescar] failed to meet their burden of establishing [either that they were entitled to judgment as a matter of law or] that the evidence was such that no two reasonable minds could disagree that the verdict should have been rendered for them.

Trial Court Opinion, 12/21/22, at 11-14 (extraneous capitalization, quotation marks, original brackets, and citation omitted).

It is well-established that "a contract is created where there is mutual assent to the terms of [an agreement] by the parties with the capacity to contract." **Shovel Transfer and Storage, Inc. v. Pennsylvania Liquor Control Bd.**, 739 A.2d 133, 136 (Pa. 1999), *citing* **Taylor v. Stanley Co. of Am.**, 158 A. 157 (Pa. 1932); *see also* **Accu-Weather, Inc. v Thomas Broad. Co.**, 625 A.2d 75, 78 (Pa. Super. 1993) (stating that, "for an agreement to exist, there must be a 'meeting of the minds,' [meaning that] that parties mutually assent to the same thing"). "As a general rule, signatures are not required unless such signing is expressly required by law or by the intent of the parties." **Shovel Transfer**, 739 A.2d at 136. Nevertheless, "it is equally well-established that an offer may be accepted by conduct and what the parties do pursuant to the offer is germane to whether the offer is accepted." **Accu-Weather**, 625 A.2d at 78 (original quotation marks and brackets omitted), *citing* **Gum, Inc. v. Felton**, 17 A.2d 386, 389 (Pa. 1941). For example, our Supreme Court in **Westinghouse Elec. Co. v.**

***Murphy, Inc.***, 228 A.2d 656 (Pa. 1967) found that a purchase order requiring a signed acknowledgement by Murphy but which remained unsigned constituted an offer accepted by Murphy, thereby forming a contract, when Murphy failed to object to the purchase order and subsequently submitted invoices referencing the purchase order. ***Murphy***, 228 A.2d at 659.

In the case *sub judice*, the purchase orders issued by Axiall to AllTranstek and Rescar contained "instructions to the vendor" that stated, "To confirm receipt and acceptance of this purchase order, please sign [and] return acknowledgement to the buyer named on this purchase order." ***See*** Exhibits 1058, 1059, 1060, and 1061 (extraneous capitalization omitted). Mark Sinclair[8] testified that, regarding the maintenance of railroad tank cars, such as AXLX 1702, Axiall would ship the railroad tank car to Rescar's Dubois facility, Rescar would inspect the railroad tank car to determine what maintenance and repair work needed to be performed, Rescar would provide a cost estimate for the recommended maintenance and repair work to AllTranstek and, in turn, AllTranstek would provide that cost estimate to Axiall. N.T., 9/22/21 (Afternoon Session), at 1576-1577. Upon receipt of the cost estimate, Axiall would then make a determination as to whether the railroad tank car should be repaired or decommissioned from service. ***Id.*** In order to

_____

[8] At the time of the incident, Mr. Sinclair was employed by Axiall as the customer service manager at the Natrium Plant. N.T., 9/22/21 (Morning Session), at 1541. Mr. Sinclair testified that as part of his duties as customer service manager, he "supported the fleet [(referring to Axiall's fleet of railroad tank cars, such as AXLX 1702,)] maintenance program[.]" ***Id.***

facilitate the on-going maintenance and repair of Axiall's railroad tank car fleet, Axiall would issue an "open-ended" or "blanket" purchase order near the start of a calendar year, and AllTranstek and Rescar would invoice against that blanket purchase order until the funding authorized by the blanket purchase order was exhausted. *Id.* at 1582-1583. Mr. Sinclair explained that purchase order 4500309931 was issued to AllTranstek on February 29, 2016, in the amount of $500,000.00 for railroad tank car fleet management services to be provided by AllTranstek. *Id.* at 1583; *see also* Exhibit 1058. Mr. Sinclair further explained that purchase order 4500307001 was issued to Rescar on February 10, 2016, in the amount of $1,750,000.00 for railroad tank car repair services to be provided by Rescar. N.T., 9/22/21 (Afternoon Session), at 1589; *see also* Exhibit 1060. The purchase orders were sent electronically to AllTranstek and Rescar upon issuance.[9] N.T., 9/22/21 (Afternoon Session), at 1592. Mr. Madock confirmed that the purchase orders were received electronically by AllTranstek and Rescar. N.T., 9/23/21 (Morning Session), at 1753. On July 31, 2016, AllTranstek submitted invoice number MO6170 to Axiall in the amount of $55,817.15 for railroad tank car fleet management

---

[9] Mr. Sinclair testified that purchase order 4500309931 was replaced with purchase order 4200002099 on April 1, 2016, and purchase order 4500307001 was replaced with purchase order 4510012399 on May 3, 2016. N.T., 9/22/21 (Afternoon Session), at 1585, 1589-1590. Mr. Sinclair explained that due to an upgrade of Axiall's computer system, the second purchase orders were issued to AllTranstek and Rescar and replaced the original purchase orders so invoices could be properly processed for payment. *Id.*

services relating to AXLX 1702 and referenced the blanket purchase order issued by Axiall to AllTranstek for these services. *Id.* at 1586-1588; *see also* Exhibit 1063. On July 27, 2016, Rescar submitted an invoice to Axiall in the amount of $53,082.32 for railroad tank car repairs relating to AXLX 1702 that referenced the blanket purchase order issued by Axiall to Rescar for these services. N.T., 9/22/21 (Afternoon Session), at 1596-1598; *see also* Exhibit 215.

Based upon a review of the record, we discern no error of law or abuse of discretion in the trial court's denial of judgment *non-obstante veredicto* on the breach of warranty and breach of contract claims. The trial court rightly rejected the contention that Axiall's purchase orders did not form enforceable contracts between Axiall and AllTranstek and Axiall and Rescar. In viewing the evidence in the light most favorable to Axiall as the verdict winner, although the purchase orders indicated that AllTranstek and Rescar were to acknowledge receipt and acceptance of the blanket purchase orders by signing the purchase orders and returning copies to Axiall, the record confirms that, after AllTranstek and Rescar received the purchase orders, both AllTranstek and Rescar performed services authorized in the respective purchase orders and submitted invoices for those services referencing Axiall's purchase orders. These actions establish acceptance of Axiall's offers, thereby forming contracts

between the parties.[10]   ***See Accu-Weather***, 625 A.2d at 78; ***see also Murphy***, 228 A.2d at 659.

We now consider whether the trial court erred in denying the request for judgment *non-obstante veredicto* on the ground that the Terms and Conditions did not become enforceable components of the contracts formed by AllTranstek's and Rescar's acceptance of Axiall's respective purchase orders.  It is well-established that the terms of a contract must be set forth with sufficient clarity.  ***Lackner v. Glosser***, 892 A.2d 21, 30 (Pa. Super. 2006)  "[N]ot every term of a contract[, however,] must always be stated in complete detail." ***Helpin v. Trustees of Univ. of Pennsylvania***, 969 A.2d 601, 611 (Pa. Super. 2009) (original brackets omitted), *aff'd*, 10 A.3d 267 (Pa. 2010).  Rather, the terms of an offer may be incorporated by reference into the parties' agreement if the party receiving the offer is provided reasonably conspicuous notice of the terms.  ***See Chilutti v. Uber Technologies, Inc.***, 300 A.3d 430, 449 (Pa. Super. 2023) (*en banc*).

Here, the record demonstrates that Axiall's purchase orders that were received by AllTranstek and Rescar contained the following statement:

> This purchase order is subject to, includes[,] and incorporates herein by reference the [Terms and Conditions] (current as of the date of this purchase order) for [Axiall] located at

---

[10] Moreover, pursuant to Axiall's Terms and Conditions, which were incorporated into the enforceable contracts, as discussed *infra*, Axiall's purchase orders were accepted by AllTranstek and Rescar because the parties did not reject their respective purchase orders in writing within ten calendar dates after receipt of the purchase order.  ***See*** Exhibit 1062, at ¶1.

http://www.axiall.com/company.  If you are unable to access this [hyperlink], please contact the buyer named in this purchase order to have these [Terms and Conditions sent *via* facsimile] to you.  [Axiall] expressly rejects anything in your documents that is inconsistent with [these Terms and Conditions].  Exceptions, if any, must be received by [Axiall] in writing within ten days of the date of this purchase order or by the purchase order delivery date, whichever is earlier; otherwise, these [Terms and Conditions] are deemed accepted by you.

*See* Exhibits 1058 and 1060 (extraneous capitalization omitted); *see also* N.T., 9/22/21 (Afternoon Session), at 1584-1585.[11]  Mr. Sinclair testified that Axiall's practice of directing a vendor, such as AllTranstek or Rescar, to visit Axiall's website to view the Terms and Conditions had been employed in prior purchase orders issued in favor of Rescar.  N.T., 9/22/21 (Afternoon Session), at 1597-1598.  Mr. Madock stated that a copy of the Terms and Conditions was not provided to AllTranstek and Rescar, directly, but acknowledged that the purchase orders directed AllTranstek and Rescar to view the Terms and Conditions on Axiall's website.  N.T., 9/23/21 (Morning Session), at 1752-1753.

Upon review, we discern no error of law or abuse of discretion in the trial court's denial of judgment *non-obstante veredicto* regarding Axiall's breach of contract and breach of warranty claims on the ground that the Terms and Conditions were not incorporated into the purchase orders.  In viewing

---

[11] Although the purchase orders issued as a result of Axiall's computer system upgrades (purchase orders 4200002099 and 4510012399) referenced the Terms and Conditions "for Eagle US 2, LLC.", the purchase orders direct AllTranstek and Rescar to visit **Axiall's website** to view the applicable Terms and Conditions.  *See* Exhibit 1059 and 1061.

the evidence in the light most favorable to Axiall as the verdict winner, the Terms and Conditions document is comprised of twenty-two paragraphs for a total of six pages of text. *See* Exhibit 1062. Axiall did not detail its Terms and Conditions within its purchase orders. Instead, Axiall incorporated its Terms and Conditions into its purchase orders by directing vendors, such as AllTranstek or Rescar, to visit its website to view the Terms and Conditions. ***See Helpin***, 969 A.2d at 611. Mr. Madock acknowledged that, although a written copy of the Terms and Conditions was not provided with the purchase orders, the Terms and Conditions could be viewed by visiting Axiall's website. Moreover, the language contained in Axiall's purchase orders conspicuously stated that the Terms and Conditions were "deemed accepted" unless the vendor raised an exception to a term or condition in writing within 10 days of receipt of the purchase order. As such, AllTranstek and Rescar were not entitled to judgment *non-obstante veredicto* on this ground.[12] ***See Chilutti***, 300 A.3d at 449.

---

[12] The Terms and Conditions provide that a signature on the purchase order was not required to form an enforceable contract. The Terms and Conditions, in addition to allowing AllTranstek and Rescar to accept the purchase orders *via* written confirmation or electronic acknowledgement, provided that the purchase orders were deemed accepted by AllTranstek and Rescar if they did not reject the purchase orders in writing within 10 calendar days of receiving the respective purchase orders or if they provided the services and work called for in the respective purchase orders. *See* Exhibit 1062, at ¶1. As discussed *supra*, the invoices sent to Axiall referencing the purchase orders demonstrate that AllTranstek and Rescar provided the services and work called for in the purchase orders, and neither party asserted that they rejected the purchase orders within 10 calendar days of receipt.

**Molding of Verdict**

In their third issue, AllTranstek and Rescar challenge the trial court's denial of their joint post-trial motion requesting that the verdict be molded to reflect Axiall's percentage of contributory negligence. AllTranstek and Rescar Brief at 53-68. Specifically, AllTranstek and Rescar assert that the trial court erred (1) by treating the damages verdict of $12,800,000.00, as a "base verdict" or one attributable equally and in full to each cause of action asserted by Axiall (*i.e.*, breach of contract, breach of warranty, and negligence);[13] and (2) by failing to reduce the verdict to $7,680,000.00 to account for the jury's finding that Axiall was 40% responsible for the damages attributed to the negligence cause of action. *Id.* AllTranstek and Rescar contend that because the verdict slip failed to include a specific interrogatory allocating damages to each cause of action, *i.e.*, negligence, breach of contract, and breach of warranty, the jury's intent in apportioning the verdict to each cause of action is unclear. *Id.* at 55-56 (asserting that, the trial court erred in sustaining Axiall's objection to AllTranstek's and Rescar's request for special interrogatories allocating damages to each cause of action and each defendant). As such, the trial court, AllTranstek and Rescar assert, "invented" a factual finding that the jury intended the verdict to be awarded in full towards each cause of action. *Id.* at 58-62. The treatment of the verdict as a "base verdict" allocable in full to each cause of action led the trial court to

---

[13] The trial court did not allocate any portion of the jury's verdict to the three theories of recovery asserted by Axiall.

the erroneous conclusion that comparative fault principles would be impermissibly extended to a contract-based cause of action if the verdict were reduced by what AllTranstek and Rescar assert was "the jury's clear intent [] that Axiall was entitled to recover [only] 60% of the [$12,800,000.00 verdict.]" *Id.* at 64. AllTranstek and Rescar contend that Axiall's "trial strategy of opposing an allocation of damages [between the various causes of action] left [Axiall's causes of action based upon breach of contract, breach of warranty, and negligence] incapable of being reduced to separate, individual judgments." *Id.* at 65. AllTranstek and Rescar assert that Axiall's negligence claim was the only cause of action capable of supporting a judgment and, as such, the comparative fault principles were applicable. *Id.* at 65.

It is well-established that a trial court has the inherent power to mold a jury verdict to conform to the clear intent of the jury. *Gorski v. Smith*, 812 A.2d 683, 708 (Pa. Super. 2002), *appeal denied*, 856 A.2d 834 (Pa. 2004); *see also Schmidt v. Campbell*, 7 A.2d 554, 597 (Pa. Super. 1939) (stating, a trial "court has the power to mold a verdict to agree with the obvious intention of the jury").

> However, while a trial court has discretion in deciding whether to mold a verdict, it must nonetheless adhere to the principle that a verdict may only be molded where the intention of the jury is clear[.] Where the intention of the jury is far from obvious the verdict should be returned to the jury for further deliberations[,] or a new trial should be granted.

*Gorski*, 812 A.2d at 708 (citation and original brackets omitted; formatting modified).

- 25 -

With this principle in mind, our review of a trial court's denial of a post-trial motion seeking to mold a verdict is limited.

> Our review is limited to determining whether the trial court abused its discretion or committed an error of law. An abuse of discretion exists when the trial court [] rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, [] failed to apply the law, or was motivated by partiality, prejudice, bias, or ill[-]will. If the alleged mistake concerned an error of law, we will scrutinize for legal error. On questions of law, our standard of review is *de novo* and our scope of review is plenary.

***Spencer v. Johnson***, 249 A.3d 529, 549 (Pa. Super. 2021) (citation omitted).

In ***Halper v. Jewish Family & Children's Serv. of Greater Philadelphia***, 963 A.2d 1282 (Pa. 2009), our Supreme Court adopted a "general verdict rule" which states that "when the jury returns a general verdict involving two or more issues and its verdict is supported as to at least one issue, the verdict will not be reversed on appeal."[14] ***Halper***, 963 A.2d at

---

[14] Our Supreme Court in ***Fritz v. Wright***, 907 A.2d 1083 (Pa. 2006) explained that a "general verdict is a finding by the jury in terms of the issue or issues referred to them and is, either wholly or in part, for the plaintiff or for the defendant." ***Fritz***, 907 A.2d at 1091. For example, a general verdict slip is one that bears "we the jury find for plaintiff (or for defendant) in the amount of _____" and no other substance will appear on the verdict slip. ***Id.***

In contrast, a general verdict with special findings is a verdict slip in which the jury is asked to answer certain questions, the answers to which are given in connection with, and lead the jury to, reaching the ultimate general verdict. ***Id.*** at 1091-1092. Thus, the last question of a general verdict with special findings "looks akin to the general verdict slip in that the amount of damages awarded to the plaintiff [is] specified." ***Id.*** at 1092. "[W]hen special findings

1288-1289. Within the context of the general verdict rule, the *Halper* Court also explained that a defendant waives the right to request a new trial based upon the general verdict if the defendant failed to request a special verdict form. *Id.* at 1289 (stating, no relief is available to a defendant "who fails to request a special verdict form [and who later complains] the jury may have relied on a factual theory unsupported by the evidence [so long as] there was sufficient evidence to support another theory properly before the jury").

In *Halper*, the adoptive parents filed a civil action against the adoption agency asserting two theories of negligence, negligent misrepresentation and negligent failure to disclose (negligent misfiling of birth mother's medical records). In that same suit, the adopted child asserted a similar negligence claim based upon the adoption agency's failure to disclose. *Id.* at 1284. The jury returned a general verdict in favor of the adoptive parents and the adopted child, having found the adoption agency was negligent. *Id.* Neither the adoptive parents and adopted child, nor the adoption agency, requested a verdict slip with special findings and, as such, the jury was not asked to differentiate between the negligent misrepresentation and negligent failure to disclose theories of recovery. *Id.* at 1284, 1288-1289. In adopting the

---

are employed in connection with a general verdict, the jury's decision is the general verdict, not the answers to the individual interrogatories[.]" *Id.*

In the case *sub judice* the jury's verdict was a general verdict with special findings. The verdict slip required the jury to answer a series of special findings (questions 1 through 13) which ultimately led the jury to its general verdict, finding in favor of Axiall in the amount of $12,800,000.00.

general verdict rule and applying it to the case at hand, the **Halper** Court held that "because a general verdict was returned and the evidence supported [the negligent failure to disclose theory of recovery], the verdict must stand." **Id.** at 1289 (stating, "we will not shift the burden [(of undergoing a new trial)] to the Halpers due to the [adoption agency's] failure to request a [verdict slip with special findings], and the evidence was clearly sufficient to support at least one of the Halpers' two theories of liability").

A decade later, our Supreme Court in **Shiflett v. Lehigh Valley Health Network**, 217 A.3d 225 (Pa. 2019) reached a similar conclusion in applying the general verdict rule. Shiflett brought an action against Lehigh Valley Health Network based on vicarious liability and corporate negligence stemming from Shiflett's time in the post-surgical unit and based on vicarious liability stemming from Shiflett's time in a transitional skills unit. **Shiflett**, 217 A.3d at 227. Shiflett's claim based upon vicarious liability, stemming from her time in the transitional skills unit, was time-barred. **Id.** at 232. The verdict slip contained special interrogatories as to each theory of liability (negligence relating to a fall in a post-surgical unit and negligent conduct in a transitional skills unit) but did not contain an interrogatory that apportioned damages between the two negligence-based claims. **Id.** at 233. Neither party objected to the format of the verdict slip. **Id.** at 231. The **Shiflett** Court stated that the evidence fully supported recovery under the theory of corporate negligence and, as such, upheld the verdict. **Id.** at 235. The **Shiflett** Court further stated that although the verdict slip did not "disclose

whether damages were awarded, in whole or in part, on the [time-barred theory of recovery (vicarious liability stemming from the nurse's conduct in the transitional skills unit),]" appellate courts, as well as the trial court, "will not presume or conjecture upon what basis the jury renders its verdict and made the award." *Id.* at 235-236. Because Shiflett had a viable theory of recovery based upon negligence stemming from Shiflett's fall in the post-surgical unit (and since a damage award could be fully attributable to that theory of liability), the **Shiflett** Court ultimately held that Lehigh Valley Health Network's right to a new trial based upon the general verdict as to damages was waived because it "failed to request a special interrogatory that could have prevented this eventuality." *Id.* at 237.

In the case *sub judice*, AllTranstek and Rescar jointly submitted proposed special interrogatories on October 6, 2021. The joint submission requested specific interrogatories regarding each of Axiall's theories of recovery - breach of contract, breach of warranty, and negligence. AllTranstek and Rescar Proposed Special Interrogatories, 10/6/21, at ¶¶1-30. AllTranstek and Rescar also requested that any damage award be broken-down by damage to AXLX 1702, damage to the Natrium Plant, payments to third parties for property damage, and lost profits. *Id.* at ¶31. If the jury awarded damages, AllTranstek and Rescar additionally requested that the jury apportion the damage award between the three theories of recovery – breach of contract, breach of warranty, and negligence. *Id.* at ¶¶32-33. Axiall subsequently submitted an amended proposed verdict slip on

October 7, 2021, that included special interrogatories regarding liability and a general verdict as to damages.[15] Axiall Amended Proposed Verdict Slip, 10/7/21, at ¶¶1-14.

At a hearing on October 8, 2021, AllTranstek and Rescar requested that the verdict slip contain an interrogatory asking the jury to apportion its damage award, if any, to Axiall's separate theories of liability.[16] N.T., 10/8/21,

---

[15] Paragraph 14 of Axiall's amended proposed verdict slip set forth a question regarding a general verdict as to damages as follows:

> If you answered "Yes" to any part of Questions 2, 9[,] or 13 [(asking whether Axiall suffered damages as a result of breach of contract, breach of warranty, or negligence)], state the amount of damages sustained by [Axiall] as a result of any of the defendant's conduct without any reduction for the percentage of negligence (if any) you attributed to [Axiall] in your answer to Question 5.
>
> $_____

Axiall Amended Proposed Verdict Slip, 10/7/21, at ¶14 (emphasis in original).

[16] In their proposed special instructions filed on October 6, 2021, AllTranstek and Rescar proposed the following interrogatories regarding the apportionment of damages by the jury:

> 31.  If your answer to Questions 28, 29, or 30 [(asking whether Axiall suffered damages as a result of breach of contract, breach of warranty, or negligence)] is yes, please list the amount of damages to which you find Axiall is entitled to for each of the following claims:
>
> a. Damage to AXLX 1702[:]                              $_____
> b. Damage to Natrium plant and equipment:             $_____
> c. Payments to third parties for property damage:     $_____
> d. Lost profit:                                       $_____

_____

Total Damages:        $_____

32.  You must now assign a percentage of the damages you awarded to each theory on which you found [AllTranstek] liable. Assign a percentage of the damages only if you found [AllTranstek] liable on that theory.  In other words, assign a percentage of damages only if you found above that (1) [AllTranstek] breached a contract and such breach was a factual cause of harm; (2) [AllTranstek] breached a warranty and such breach was a factual cause of harm; and/or (3) [AllTranstek] was negligent and such negligence was a factual cause of harm.  The total must equal 100%.

a. Breach of Contract:                               _____%
b. Breach of Warranty:                               _____%
c. Negligence:                                              _____%

Total:                        100%

33.  You must now assign a percentage of the damages you awarded to each theory on which you found [Rescar] liable. Assign a percentage of the damages only if you found [Rescar] liable on that theory.  In other words, assign a percentage of damages only if you found above that (1) [Rescar] breached a contract and such breach was a factual cause of harm; (2) [Rescar] breached a warranty and such breach was a factual cause of harm; and/or (3) [Rescar] was negligent and such negligence was a factual cause of harm.  The total must equal 100%.

a. Breach of Contract:                               _____%
b. Breach of Warranty:                               _____%
c. Negligence:                                              _____%

Total:                        100%

AllTranstek and Rescar Proposed Special Instructions, 10/6/21, at ¶¶31-33.

Superheat joined the request for a special damages interrogatory submitted by AllTranstek and Rescar.  N.T., 10/8/21, at 4018.

at 4018. AllTranstek and Rescar argued that "given the nature of the contract claim in particular, [it is] important that the jury be able to give us guidance on what theory [the jury] may have attributed to certain damage categories." *Id.* The trial court denied AllTranstek's and Rescar's request for a special damages interrogatory, stating, "I've never in a contract case assigned percentages." *Id.* at 4018-4019.

Thereafter, Axiall submitted a second amended proposed verdict slip on October 12, 2021. Among other things, Axiall's amended proposed verdict slip contained a general verdict as to damages but, rather than requesting a single dollar amount, Axiall requested that any damage award be identified as damage to the Natrium Plant, payments to third parties for property damage, and lost profits. Axiall Second Amended Proposed Verdict Slip, 10/12/21, at ¶14.

On October 14, 2021, AllTranstek and Rescar filed a proposed amended verdict slip that included special interrogatories asking the jury whether Axiall met its burden of proof on each theory of liability but did not ask the jury to apportion its damage award, if any, according to each theory of liability.[17] In other words, rather than asking the jury to allocate its damage award according to the theories of liability, the proposed amended verdict slip asked

_____

[17] Conspicuously absent from the proposed amended verdict slip filed by AllTranstek and Rescar on October 14, 2021, were interrogatories asking the jury to apportion the damage award, if any, by Axiall's theories of liability - breach of contract, breach of warranty, or negligence.

only that the jury separate its damage award, if any, into three categories – damage to the Natrium Plant, payments to third parties for property damage, and lost profit.[18]  AllTranstek and Rescar Proposed

---

[18] Specifically, AllTranstek's and Rescar's proposed amended verdict slip included the following question regarding damages:

> 16. If you answered "Yes" to any part of Questions 5, 10[,] or 12 [(asking whether Axiall suffered damages as a result of breach of contract, breach of warranty, or negligence)], state the amount of damages sustained by Axiall [] in each category below as a result of any of the defendants' conduct without any reduction for the percentage of negligence (if any) you attributed to Axiall [] in your answer to Question 15.
>
> a. Damage to Natrium plant and equipment:    $_____
> b. Payments to third parties for property damages:    $_____
> c. Lost Profit:    $_____
>
>      Total Damages:    $_____

AllTranstek and Rescar Proposed Amended Verdict Slip, 10/14/21, at ¶16 (emphasis in original).

One distinction between Axiall's proposed verdict slip and the proposed verdict slip submitted by AllTranstek and Rescar was that Axiall's interrogatories pertaining to its negligence claim appeared first on the verdict slip followed by interrogatories pertaining to its breach of contract and breach of warranty claims.  The proposed verdict slip submitted by AllTranstek and Rescar presented interrogatories regarding the breach of contract and breach of warranty claims first, followed by interrogatories related to the negligence claim.  *Compare* Axiall Second Amended Proposed Verdict Slip, 10/12/21 *with* AllTranstek and Rescar Proposed Amended Verdict Slip, 10/14/21.  Both proposed verdict slips contained an almost identical general verdict interrogatory regarding damages.  *Compare* Axiall Second Amended Proposed Verdict Slip, 10/12/21, at ¶14 *with* AllTranstek and Rescar Proposed Amended Verdict Slip, 10/14/21, at ¶16.

Amended Verdict Slip, 10/14/21, at ¶¶1-16. More simply, the amended proposed verdict slip filed on October 14, 2021, did not include paragraphs 32 and 33 from AllTranstek's and Rescar's proposed special instructions that were filed on October 6, 2021, and reproduced *supra*.

That same day, October 14, 2021, at a hearing before the trial court, AllTranstek and Rescar expressed a concern that, in its closing argument, Axiall asserted that evidence was presented showing that Rescar overcharged for the repairs of AXLX 1702.[19] N.T., 10/14/21, at 4511. Specifically, the following dialogue occurred between the parties and the trial court:

---

A second distinction between the two proposed verdict slips was that AllTranstek and Rescar requested that the verdict slip include special interrogatories asking whether Axiall's purchase orders formed contracts between AllTranstek and Axiall and between Rescar and Axiall. **See** AllTranstek and Rescar Proposed Amended Verdict Slip, 10/14/21, at ¶¶1, 6; **see also** N.T., 10/13/21 (Afternoon Session), at 4494-4498. The trial court denied AllTranstek's and Rescar's request to include special interrogatories on the verdict slip as to whether the purchase orders formed contracts between the parties. N.T., 10/14/21, at 4515-4516.

[19] In closing remarks, counsel for Axiall argued,

[O]nce the repairs were made [to AXLX 1702] in 2016[,] and the [railroad tank] car was released to Axiall, as far as Rescar was concerned, [AXLX 1702] was fit for chlorine service. . . .

That makes all the sense in the world. Why would Rescar bid to fix a [railroad tank] car, repair the [railroad tank] car, charge for the repairs, **overcharge for the repairs**, make the repairs, and then tell Axiall, "You know what? This wasn't such a good idea. We don't think that you ought to return this [railroad tank] car to chlorine service."

| [AllTranstek/Rescar:] | Breach of contract. In the closing and during the trial, there was evidence raised about this overcharge. You heard that, the $13,000[.00]] overcharge. Now, there is no claim for that in the complaint. And frankly, they didn't ask the jury for it in their award, but we have this general question in the special interrogatories. Did Rescar breach its contractual duties to Axiall resulting in damage? Well, the jury could easily say, oh, they overcharged them. That's a breach, and it caused damage, $13,000[.00]. Of course that has nothing to do with the damage we're here about. |
|---|---|
| [Trial Court:] | You would love that if they did that. |
| [AllTranstek/Rescar:] | Correct, but there is no way to do it the way the special interrogatories are set because there's no place for them to list damages resulting from breach of contract and putting down $13,000[.00]. |
| | The way it is now, the only damages they are given are damages to the plant, lost profits, third party claims. So, you know, and you know the impact of this, Your Honor. I now understand why they wanted negligence first and why they wanted an instruction about there can't be a double recovery, **because you understand that a breach of contract finding eliminates any reduction. They could find a 40 percent contributory negligence. That applies to the negligence claim**, but if they find a breach of contract based on an overcharge, and it isn't clear that they are awarding $13,000[.00], then, in fact, we |

N.T., 10/13/21 (Afternoon Session), at 4445 (emphasis added).

- 35 -

> could have that entire damages imposed on us for an immaterial breach of contract.
>
> I think the solution frankly, Your Honor, is simple, is just instruct the jury, since they haven't sought that, that the evidence you heard about the overcharge can't be the basis of a breach of contract claim against my client would be one simple way to handle it.

| | |
|---|---|
| [Axiall:] | If the jury finds that that is a breach, then the jury can pencil in $13,000[.00]. |
| [AllTranstek/Rescar:] | [N]ot if there's not a line for it. |
| [Trial Court:] | I'm not going to change [the verdict slip.] We've got instructions to the jury that are extensive. . . . I think we're just going to go with what we have, and they are going to decide something. |
| [AllTranstek/Rescar:] | Obviously we'd reserve this for the record. We feel strongly about it, but it's your call. |

*Id.* at 4510-4513 (emphasis added).

In so arguing, AllTranstek and Rescar asserted that the jury could find that Rescar breached its contractual duties to Axiall by overcharging Axiall for the repairs of AXLX 1702 and award damages based solely upon the overcharge. *Id.* At the hearing, AllTranstek and Rescar did not specifically request a special interrogatory asking the jury to identify the portion of damages awarded for each of Axiall's causes of action. *Id.* Rather, AllTranstek and Rescar argued that without a jury instruction providing either an express limit to damages stemming from an overcharge or a statement that the overcharge could not be the basis of recovery under a breach of

- 36 -

contract claim, AllTranstek and Rescar could be held liable for the total damage award (including damage to the Natrium Plant, payments to third parties for property damage, and lost profits) based solely upon an overcharge for repair services. *Id.* at 4511-4512.

The trial court, ultimately, decided to utilize the proposed verdict slip submitted by Axiall, which, *inter alia*, asked the jury to allocate the total damage award between damage to the Natrium Plant, payments to third parties for property damage, and lost profits, but did not ask the jury to apportion its damage award, if any, between Axiall's theories of liability.[20] In its charge to the jury, the trial court instructed the jury, in pertinent part, as follows:

> At this point, I want to instruct you on the claims that Axiall has filed against AllTranstek, Rescar, and Superheat.
>
> Specifically, Axiall sued AllTranstek[ and] Rescar for breach of warranty, breach of contract[,] and negligence. Axiall claims that as a result of [the defendants'] breach of warranty, breach of contract[,] and negligence, that it sustained property damage and incurred other losses. Axiall has also sued Superheat for negligence, claiming that Superheat's negligence caused [Axiall] to sustain property damage and incur other losses.
>
> In order for you to arrive at a verdict on Axiall's claims against AllTranstek, Rescar[,] and Superheat, you must resolve the following factual questions by a preponderance of the evidence.
>
> First, whether or not the contracts between Axiall and AllTranstek and Rescar contained an express warranty. Second, whether or

---

[20] The verdict slip utilized by the trial court did not include questions as to whether the purchase orders formed contracts between AllTranstek and Axiall and between Rescar and Axiall, as proposed by AllTranstek and Rescar.

not AllTranstek and Rescar breached any warranty. Third, whether or not AllTranstek['s] and Rescar's breach of any warranty resulted in damage to Axiall. Fourth, whether or not AllTranstek and Rescar otherwise breached their contracts with Axiall. Fifth, whether or not any breach of that contract by AllTranstek and Rescar caused damages to Axiall. Sixth, whether or not AllTranstek and Rescar were negligent in the performance of their services to Axiall, and if so, whether or not that negligence was a cause of the rupture of AXLX 1702. Seventh, whether or not Superheat was negligent in the performance of its services. And, if so, whether or not that negligence was a cause of the rupture of AXLX 1702. Eighth, whether or not Axiall was negligent in its duties as a [railroad] tank car owner. If so, whether or not that negligence was a cause of the rupture of AXLX 1702. And ninth, **if you find a breach of warranty and/or breach of contract and/or negligence on the part of the defendants that resulted in the rupture of AXLX 1702, you must determine the appropriate measure of damages.**

Start with breach of warranty. [] Axiall asserts that its contracts contained an express warranty that was breached by AllTranstek and Rescar. AllTranstek and Rescar deny that any express warranty existed. Axiall bears the burden of proving that the express warranty contained in its [T]erms and [C]onditions is a part of the contract between the parties. You should evaluate whether Axiall has met this burden of proof based on my prior instructions regarding burden of proof.

Now with regard to breach of contract, Axiall claims that Rescar and AllTranstek did not do what they agreed to do under their contracts with Axiall. This is called a breach of contract. Axiall claims that Rescar['s] and AllTranstek's breach of these contracts caused its harm for which Rescar and AllTranstek should pay money damages.

Axiall must prove the following: The existence of a contract, including its essential terms, and that Rescar and AllTranstek breached a duty created by that contract. Axiall and Rescar had a contract pursuant to which Rescar was to perform repair and maintenance services on some of Axiall's railroad tank cars, including AXLX 1702. Axiall and AllTranstek also had a contract pursuant to which AllTranstek was to assist in the management of Axiall's fleet of railroad tank cars, including AXLX 1702.

. . .

With respect to Axiall's claim of negligence, Axiall claims that all the defendants were negligent and that the defendant[s'] negligence was a factual cause of Axiall's damages. Axiall has the burden of proving its claims against each defendant.

The defendants deny Axiall's claim. In addition, as a defense, the defendant[s] claim that Axiall was negligent and that Axiall's own negligence was a factual cause in bringing about Axiall's damages.

The defendants have the burden of proving this defense. So the issues that you must decide in accordance with the law as I give it to you are first, were AllTranstek, Rescar[,] and/or Superheat negligent? Was the negligent conduct of AllTranstek, Rescar[,] and/or Superheat a factual cause in bringing about the damages to Axiall? Was Axiall also negligent? Was Axiall's negligent conduct also a factual cause in bringing about its own damage?

In this case, you must decide whether AllTranstek, Rescar, Superheat[,] or Axiall [were] negligent.

. . .

Axiall is entitled to recover for all damages factually caused by the defendants' negligence. The defendants' negligence need not be the sole cause of the damages. Other causes may have contributed to producing the final result. The fact that some other factor may have contributed to a harm does not relieve defendants of liability unless you find that such other causes would have produced the harm complained of independently of defendants' negligence.

As a defense, the defendants claim that Axiall's own negligence was a factual cause of its harm. The defendants have the burden of proof of both of the following: One, that Axiall was negligent, and, two, Axiall's negligence was a factual cause of its harm.

If you find that Axiall's percentage of negligence is greater than 50 percent, then Axiall cannot recover its damages.

If you decide that Axiall and one or more of the defendants were negligent, and that the negligence of Axiall and one or more of the defendants was a factual cause of Axiall's damages, you should state each parties' share of the negligence that contributed to Axiall's damages. You should state each parties' share of the

negligence in the form of a percentage. Together these percentages must total 100 percent.

If you decide that Axiall's negligence was greater than 50 percent, then Axiall cannot recover. If you decide that Axiall's **negligence** was less than or equal to the **combined negligence** of AllTranstek, Rescar[,] and/or Superheat, I will reduce Axiall's damages based on **the percent of negligence** you have assigned to the parties.

I will now instruct you on damages. The fact that I am instructing you about damages does not imply any opinion on my part as to whether damages should be awarded. If you find that AllTranstek['s] or Rescar's negligence or breach of contract or [breach of] warranty or Superheat's negligence caused damage to Axiall's property, you must then determine an amount of money damages that you find will fairly and adequately compensate Axiall for all the damage that it sustained as a result. The amount you award today must compensate Axiall completely for damages sustained in the past as well as damages Axiall will sustain in the future.

. . .

Axiall will only recover the amount you determine is the total to which it is entitled. **In other words, a verdict in Axiall's favor on more than one of its claims will not result in a double recovery for Axiall.**

N.T., 10/14/21, at 4532-4545 (emphasis added). At the conclusion of the jury charge, none of the parties lodged an objection to any portion of the jury instructions. *Id.* at 4557.

Upon conclusion of deliberations, the jury returned a general verdict in the amount of $12,800,000.00, having designated $5,900,000.00 in damages to the Natrium Plant, $3,400,000.00 in damages for third-party payments, and $3,500,000.00 in damages for lost profits. *Id.* at 4561-4562; *see also* Verdict Slip, 10/18/21. The trial court then asked counsel for all parties if the

jury could be excused, to which all counsel responded in the affirmative.  N.T.,

10/14/21, at 4562.  Thereupon, the jury was dismissed.  *Id.*

The trial court, after dismissing the jury, asked counsel it they wished

to place anything on the record.  *Id.*  The following dialogue occurred:

| | |
|---|---|
| [AllTranstek/Rescar:] | I'm trying to think of the consistency of the verdict.  That's all. |
| [Trial Court:] | It seemed consistent to me.  That's why I read it.  I would have sent them out of the room and discussed it with you guys but it seemed - |
| [AllTranstek/Rescar:] | And it was unanimous on all of them? |
| [Trial Court:] | Seemed perfectly consistent to me.  Do you guys agree? |
| (*All nod heads*) | |
| [Trial Court:] | Might not be what anybody wanted, but it was internally consistent with the questions that we asked. |
| [AllTranstek/Rescar:] | Nothing. |
| [Trial Court:] | Anything else? |
| [Axiall:] | No. |
| [Trial Court:] | Superheat?  Anything for the plaintiff for the record before we close? |
| [Axiall:] | No, Your Honor. |
| [Trial Court:] | If there is nothing further, this proceeding is concluded. |

*Id.* at 4562-4563.

At the heart of AllTranstek's and Rescar's challenge to the denial of its

post-trial motion to mold the verdict is the assertion that the trial court erred

in denying their request for special interrogatories apportioning a damage award, if any, to each theory of recovery. Before reviewing this issue, we first examine whether AllTranstek and Rescar preserved their challenge to the denial of special interrogatories concerning apportionment of damages by raising the issue at **all stages** of the trial.

Embedded in the bedrock of Pennsylvania jurisprudence is the well-established principle that to preserve an issue for appellate review, a party is required to make a timely specific objection in order to provide the trial court the opportunity to correct the alleged error, if necessary.[21] ***Dilliplaine***, 322 A.2d at 116. This principle, commonly known as the "contemporaneous objection rule," has been codified in Pennsylvania Rule of Civil Procedure 227.1, which states,

> post-trial relief may not be granted unless the grounds therefor, (1) if then available, were raised in pre-trial proceedings or by motion, objection, point for charge, request for findings of fact or conclusions of law, offer of proof[,] or other appropriate method at trial; and (2) are specified in the motion. The motion shall state how the grounds were asserted in pre-trial proceedings or at trial. Grounds not specified are deemed waived unless leave is granted upon cause shown to specify additional grounds.

Pa.R.Civ.P. 227.1(b)(1) and (2).

---

[21] In so holding, our Supreme Court in ***Dilliplaine v. Lehigh Valley Trust Co.***, 322 A.2d 114 (Pa. 1974) abolished the prior practice whereby appellate courts considered trial court errors that were claimed to be basic and fundamental despite the absence of any objection or specific exception at trial. ***Dilliplaine***, 322 A.2d at 116.

In applying the principle first announced in **_Dilliplaine_**, **_supra_**, our Supreme Court later held that the failure to object "to the inconsistency of the jury's answers to the interrogatories when the verdict was rendered" constituted waiver of a challenge to the verdict. **_City of Philadelphia, Police Dept. v. Gray_**, 633 A.2d 1090, 1095 (Pa. 1993). In **_Gray_**, the plaintiff[22] sustained injuries when a trolley car she was riding collided with an unmarked police vehicle driven by a City of Philadelphia police officer. **_Gray_**, 633 A.2d at 1091. The trolley car was owned and operated by Southeastern Pennsylvania Transportation Authority ("SEPTA"). **_Id._** The plaintiff filed a cause of action for negligence against SEPTA and the City of Philadelphia Police Department, seeking damages for personal injuries. **_Id._** at 1092. At the conclusion of trial, the jury was presented with interrogatories asking it to answer, _inter alia_, whether or not the SEPTA trolley car driver was negligent in the operation of the trolley car, and if yes, whether the driver's negligence was a substantial factor in causing the plaintiff's injuries, and whether the police officer was negligent in the operation of the police vehicle, and if yes, whether the police officer's negligence was a substantial factor in causing the plaintiff's injuries. **_Id._** at 1094. Prior to jury deliberation, the plaintiff did not

---

[22] The case involving Joan Gray (**_Gray_**, **_supra_**,) was consolidated with a second case, captioned as **_Williams v. Se. Pennsylvania Transp. Auth._**, 633 A.2d 1090, 1095 (Pa. 1993), for the purpose of review by our Supreme Court. Our discussion of Supreme Court precedent focuses on that portion of the **_Gray_** decision that involved the consolidated action filed by Kathleen Williams. As such, for clarity, ease of identification, and discussion, we refer to Williams as "the plaintiff," but our case citations shall refer to **_Gray_**, **_supra_**.

object to either the jury instructions or the interrogatories submitted to the jury. *Id.* In answering the interrogatories, the jury found the SEPTA trolley car driver was negligent but that the driver's negligence was not a substantial factor in causing the plaintiff's injuries. *Id.* The jury further found that the police officer was negligent in the operation of the police vehicle and that the police officer's negligence was a substantial factor in causing the plaintiff's injuries. *Id.* The jury then responded that SEPTA was 25% negligent and the City of Philadelphia Police Department was 75% negligent. *Id.* at 1094-1095. The jury awarded the plaintiff $20,000.00 in damages. *Id.* at 1095.

In a post-trial motion, the plaintiff requested judgment *non obstante veredicto* against SEPTA or, in the alternative, a new trial due to the inconsistency of the jury's answers to the interrogatories.[23] *Id.* at 1094. The trial court denied the plaintiff's motion, and entered judgment in favor of the plaintiff and against SEPTA in the amount of $2,000.00 (25% of the total

---

[23] In her post-trial motion, the plaintiff asserted that the finding that the SEPTA trolley car driver's negligence was not a substantial factor in causing the accident "was an unnecessary characterization which [was] inconsistent with the finding of causal negligence of twenty-five percent." *Williams v. Se. Pennsylvania Transp. Auth.*, 1989 WL 817137 (C.P. Phila. Cnty. filed Jul. 12, 1989) (unpublished opinion). Stated differently, the plaintiff asserted that the jury verdict was inconsistent because "reasonable [individuals] could not differ that if the [SEPTA trolley car driver were] negligent at all in his operation of the trolley car, his negligence had to be a substantial factor in causing the accident and [the] plaintiff's injuries as a matter of law." *Williams v. Se. Pennsylvania Transp. Auth.*, 574 A.2d 1175, 1177 (Pa. Cmwlth. 1990).

damage award).[24]   The Commonwealth Court affirmed the trial court order denying the post-trial motion.   **Williams**, 574 A.2d at 1176, 1178.   In affirming, the Commonwealth Court observed that "[t]he essence of [the plaintiff's] argument is a challenge to the jury charge and the interrogatories submitted to the jury."  **Id.** at 1178.  Because the plaintiff "neither objected to the jury charge nor the wording of the interrogatories prior to the case going to the jury[,]" the Commonwealth Court held that the plaintiff waived this issue.  **Id.**; **see also Gray**, 633 A.2d at 1092.

Our Supreme Court, upon review in **Gray**, **supra**, held that the Commonwealth Court erred in finding that the plaintiff waived the issue by failing to object to the jury instructions or interrogatories prior to the case going to the jury.  **Gray**, 633 A.2d at 1095.  The **Gray** Court explained that the interrogatories that were presented to the jury prior to deliberation did not call for inconsistent answers and, therefore, the plaintiff was not required to object to the interrogatories in order to preserve the issue.  Rather, the "objection to the interrogatories would only arise[, the **Gray** Court clarified,] when inconsistent answers were given."  **Id.**  The **Gray** Court, thereupon, found that the failure to "object to the inconsistency of the jury's answers to

---

[24] The **Gray** Court explained that the police officer's negligence, and thus the City of Philadelphia Police Department's liability, for 75% of the damage award was governed by the Political Subdivision Tort Claims Act, 42 Pa.C.S.A. §§ 8541 – 8564.  **Gray**, 633 A.2d at 1092-1094.

the interrogatories when the verdict was rendered" resulted in waiver.[25] *Id.*,

*citing **Dilliplaine**, **supra**; **see also Fillmore v. Hill**,* 665 A.2d 514, 516

(Pa. Super. 1995) (stating, "Pennsylvania courts have extended [the

**Dilliplaine**] waiver rule to include cases involving inconsistent verdicts),

*appeal denied*, 674 A.2d 1073 (Pa. 1996); **King v. Pulaski**, 710 A.2d 1200,

1203 (Pa. Super. 1998) (stating, "a party must make a timely and specific

objection before the trial court **at the appropriate stage of the**

**proceeding**[, as the] failure to do so will result in waiver of the issue"

(emphasis added)); **Shelhamer v. Crane**, 58 A.3d 767, 772 (Pa. Super.

2012) (holding that, the failure to object to a verdict at the time it was

rendered and it became known that the jury's answers to various

interrogatories were inconsistent resulted in waiver).  In other words, an

objection to interrogatories, which on their face did not call for inconsistent

answers prior to deliberation, was not necessary for issue preservation but

once the inconsistent answers were provided by the jury, an objection lodged

prior to the dismissal of the jury was required to preserve the issue.  Explained

differently, the plaintiff's claim that the interrogatories would result in an

inconsistent verdict was only a hypothetical prior to deliberation, therefore no

objection was necessary.  Once the inconsistency of the verdict became known

---

[25] Ultimately, the **Gray** Court reversed the order of the Commonwealth Court and remanded the case to the trial court for a new trial.  **Gray**, 633 A.2d at 1095.

upon pronouncement of the verdict, however, the grounds for objection became a reality and a lodged objection was required.[26]

In ***Criswell v. King***, 834 A.2d 505 (Pa. 2003), our Supreme Court reaffirmed its decision in ***Gray***, ***supra***, "that an inconsistent verdict provides grounds for objection and, if a party seeks relief upon grounds of verdict inconsistency, [the party] must forward a timely, contemporaneous objection **upon the rendering of the verdict**."[27]  ***Criswell***, 834 A.2d at 513.  The ***Criswell*** Court explained that the application of ***Dilliplaine***, and its progeny, to inconsistent verdicts allows for the correction of errors before the trial ends,

_____

[26] This Court has recognized, and referred to, an "inconsistent verdict" as a verdict that, on its face or appearing within the four corners of the verdict slip, is inconsistent, irrational, problematic, incredible, ambiguous, or simply unclear.  ***Avery v. Cercone***, 225 A.3d 873, 877-879 (Pa. Super. 2019).  As such, our use of the term "inconsistent" in the context of our discussion herein encompasses a verdict that is "inconsistent," as well as one that is irrational, problematic, incredible, ambiguous, or merely unclear.  Thus, when a verdict meets any of those definitions of "inconsistent" **and** the party objects to the verdict before the jury is dismissed, the trial court should send the jury back to the deliberation room with the instruction to clarify, not reconsider, the verdict in order to provide the necessary clarity as to the jury's intent.  ***Id.*** at 877.

[27] In reaffirming ***Gray***, ***supra***, the ***Criswell*** Court noted that "***Gray*** does not hold [] that a party's failure to object to an inconsistent verdict before the jury is dismissed waives **any** right to a new trial [but, rather,] ***Gray*** simply held that a party's failure to object to a jury's allegedly inconsistent verdict before the jury is dismissed waives [a challenge to an inconsistent verdict as grounds for a new trial]."  ***Criswell***, 834 A.2d at 510-511 n.2 (original quotation marks, citations, and original brackets omitted; emphasis in original) (explaining that, the failure to object on the grounds the verdict is against the weight of the evidence before the jury is dismissed does not result in waiver).

thereby eliminating avoidable appeals and advancing judicial economy. *Id.* at 509.

In *Schmidt v. Boardman Co.*, 11 A.3d 924 (Pa. 2011), our Supreme Court again reaffirmed the *Dilliplaine* waiver principle, stating "we believe the general requirement that one challenging a civil verdict must raise and preserve challenges **at all stages** best reconciles with our existing rules and approach to trial and appellate practice."[28] *Schmidt*, 11 A.3d at 941-942 (emphasis added) (rejecting a futility exemption "that does not require useless objections" in favor of a requirement that potential challenges must be identified early in litigation and at all stages of litigation).

Our Supreme Court, in *Samuel-Bassett v. Kia Motors Am., Inc.*, 34 A.3d 1 (Pa. 2011), held that because the alleged error of an inconsistent verdict was "evident when the verdict slips and the trial instructions were agreed upon and formulated[,]" Kia Motors should have objected "to the verdict sheets when composed and offered to the jury, to the related jury charge, or, at the latest, contemporaneous with the actual molding of the verdict." *Samuel-Bassett*, 34 A.3d at 45-46. In *Samuel-Bassett*, the issue raised on appeal asserted that the verdict sheet, jury instructions, and, ultimately, the verdict were inconsistent with an earlier ruling by the trial

---

[28] In a case posing a similar preservation issue, we note that then-Judge Wecht (now Justice Wecht) writing for this Court reiterated that "challenges to a civil verdict must be raised and preserved **at all stages**." *Mazurek v. Russell*, 2014 WL 10752064, at *4 (Pa. Super. filed Dec. 18, 2014) (non-precedential decision).

court. *Id.* Thus, the potential for an inconsistent verdict was known (*i.e.*, existed in reality) when the verdict sheet was composed and offered to the jury, after the jury was charged, and upon pronouncement of the verdict. Therefore, in order to preserve the issue, Kia Motors was required to object to the verdict sheet, the jury instructions, or upon the rendering of the verdict. *Id.* at 46.

Thus, the decisions in *Schmidt*, *supra*, and *Samuel-Bassett*, *supra*, reenforced the procedural concept announced in *Gray* - an objection to interrogatories that did not, on its face, ask a jury to provide inconsistent answers was unnecessary but an objection was required for issue preservation once the jury rendered a verdict that was inconsistent. This approach is further reiterated in Rule 227.1(b) that requires an objection to be lodged **if then available** (*i.e.*, known with certainty). Pa.R.Civ.P. 227.1(b)(1).

Finally, in *Stapas v. Giant Eagle, Inc.*, 198 A.3d 1033 (Pa. 2018), our Supreme Court held that "Giant Eagle waived its challenge to the jury's verdict by failing to object to the verdict before the trial court dismissed the jury." *Stapas*, 198 A.3d at 1041. Stapas filed a complaint asserting negligence claims against Giant Eagle for injuries Stapas sustained at a Giant Eagle GetGo convenience store while defending a Giant Eagle employee (and personal friend) from the actions of an argumentative and hostile third-party. *Stapas*, 198 A.3d at 1034. In his complaint, Stapas did not make a claim for future lost wages. *Id.* The verdict slip asked the jury to determine individual damages for scarring, wage loss, past and future medical expenses, past,

present, and future pain and suffering, and loss of life's pleasures. *Id.* at 1035. The verdict slip also asked the jury to state a total damage award comprised of the individual damage determinations. *Id.* Conspicuously absent from the individual damage determination for "wage loss" was the need to expressly determine both past wage loss and future wage loss. *Id.* The jury, in rending its verdict, however, awarded past wage loss in the amount of $3,000.00 and future wage loss in the amount of $1,300,000.00 by writing into the verdict slip each distinct type of wage loss and an amount. *Id.* Upon the pronouncement of the verdict, Giant Eagle did not lodge an objection and assert that the verdict was inconsistent. In finding that Giant Eagle waived its challenge to the jury verdict, and in particular the award of future wage loss, our Supreme Court explained that "[w]hen the trial court's tipstaff read the jury's itemized verdict, Giant Eagle **had a basis to object** [(*i.e.*, the basis for the objection became available)] because the verdict did not conform to the trial court's instruction to return a single, lump-sum verdict and because the jury awarded damages for future lost wages, a category of damages that Stapas was not entitled to [receive] as a matter of law." *Id.* at 1041. In so holding, the decision in *Stapas*, *supra*, is consistent with *Dilliplaine*, *Gray*, and their progeny, in that when the inconsistency of the verdict becomes a concrete and discernible error, the basis for the objection becomes available

and a party is required to object to the rendered verdict before the jury is dismissed or face waiver of a challenge to the verdict.[29]

Here, the record demonstrates that on October 6, 2021, AllTranstek and Rescar proposed special interrogatories requesting, *inter alia*, that the jury apportion its damage award, if any, between each theory of recovery – breach of contract, breach of warranty, and negligence. AllTranstek and Rescar Proposed Special Interrogatories, 10/6/21, at ¶¶32-33. On October 7, 2021, Axiall filed an amended proposed verdict slip that included, *inter alia*, a general verdict as to damages, which permitted the jury to express its award as a lump sum. Axiall Amended Proposed Verdict Slip, 10/7/21, at ¶14. At an October 8, 2021 hearing, AllTranstek and Rescar orally requested the apportionment of a damage award, if any, between each theory of recovery.

---

[29] We are cognizant that the ***Stapas*** Court stated

> Giant Eagle had multiple opportunities to preserve this ground for post-trial relief during the trial court proceedings but failed to do so. Specifically, Giant Eagle did not request a point for charge limiting wage loss to only past wage loss, did not object to the jury interrogatory listing "wage loss" as a category of damages, and did not object to the trial court's damages instructions.

***Stapas***, 198 A.3d at 1041. This *obiter dictum* pronouncement seemingly emphasizes the multiple opportunities Giant Eagle had to avoid paying damages for future wage loss, but the ***Stapas*** Court did not rely upon these grounds for finding waiver. As discussed *supra*, the ***Stapas*** Court ultimately found that Giant Eagle's "basis to object" ripened, or became available, when the jury's itemized verdict was read in open court. It was at this moment that Giant Eagle needed to lodge an objection before the dismissal of the jury to preserve its challenge to the verdict. ***Id.***

N.T., 10/8/21, at 4018.  The trial court denied AllTranstek's and Rescar's request for apportionment of damages by theory of recovery.  *Id.* at 4019.

On October 12, 2021, Axiall filed a second amended proposed verdict slip that included a general verdict as to damages but asked the jury to state its damage award according to three distinct categories - damage to the Natrium plant, payments to third parties, and lost profits.  Axiall Second Amended Proposed Verdict Slip, 10/12/21, at ¶14.  On October 14, 2021, AllTranstek and Rescar filed a proposed amended verdict slip that did not include interrogatories asking the jury to apportion its damage award, if any, between each theory of recovery.  AllTranstek and Rescar Proposed Amended Verdict Slip, 10/14/21.  At a hearing held that same day, however, AllTranstek and Rescar again raised an argument regarding apportionment of damages by theory of recovery within the context of a discussion regarding a $13,000.00 overcharge.  N.T., 10/14/21, at 4510-4512.  The trial court denied AllTranstek's and Rescar's request to modify the verdict slip.  *Id.* at 4512.  Thereupon, the trial court charged the jury, to which no objections were lodged.  *Id.* at 4557

That same day, October 14, 2021, the jury returned a verdict in favor of Axiall, finding that AllTranstek was 20% negligent, Rescar was 40% negligent, and AllTranstek and Rescar breached their contracts and warranties with Axiall.  *Id.* at 4560-4561.  The jury awarded total damages in the amount of $12,800,000.00 with $5,900,000.00 assigned to damage to the Natrium Plant, $3,400,000.00 assigned to payments to third-party claims, and

$3,500,000.00 assigned to lost profits. *Id.* at 4561-4562. None of the parties lodged an objection to the verdict and, when asked, all parties agreed the jury could be dismissed. *Id.* at 4562.

Although AllTranstek and Rescar submitted a request for special interrogatories requesting that the jury apportion its damage award, if any, between the three theories of recovery, the verdict slip did not, on its face, call for an inconsistent verdict. Using the verdict slip that contained special interrogatories regarding the three theories of recovery and a general verdict as to damages, the jury, for example, was free to find AllTranstek and Rescar breached their contracts and warranties with Axiall but were not negligent or, even if finding that the two party-defendants were negligent, that Axiall's contributory negligence was greater than 50%, thus barring recovery on the negligence claim. Under these circumstances, an award of damages would relate to a finding of liability under the contractual theories of recovery (breach of contract and breach of warranty) and would not relate to the negligence theory of recovery. As such, the verdict slip, as submitted to the jury, did not on its face call for an inconsistent verdict.

Once the jury rendered its verdict and the verdict was read in open court (*see* N.T., 10/14/21, at 4560-4562), it became clear that the jury had, indeed, rendered an ambiguous, inconsistent verdict. In other words, it became a reality that the verdict slip expressed a damage award in the amount of $12,800,000.00 without a clear understanding of whether the damage award was solely the result of finding AllTranstek and Rescar breached their contracts

with Axiall, or breached their warranties with Axiall, or were negligent in causing the damages, or if the damage award resulted from a combination of defense-liability under all three theories of recovery. Thus, upon the reading of the verdict in open court, AllTranstek's and Rescar's basis for objection, namely that the verdict was inconsistent, ripened and became available. At this time, AllTranstek and Rescar were required to lodge a contemporaneous objection (reintroducing their previously stated concern about allocation of liability according to theory of relief) prior to the dismissal of the jury. The record reveals, however, that AllTranstek and Rescar did not lodge such an objection prior to the dismissal of the jury. Therefore, we are constrained to find that AllTranstek and Rescar waived any objection to the verdict slip and this issue cannot now form the basis of their post-trial motion for altering the verdict. **See** Pa.R.Civ.P. 227.1(b)(1); **see also Dilliplaine**, 322 A.2d at 116; **Gray**, 633 A.2d at 1095; **Criswell**, 834 A.2d at 513; **Schmidt**, 11 A.3d at 942; **Samuel-Bassett**, 34 A.3d at 45-46; **Stapas**, 198 A.3d at 1041.

### Attorney's Fees

In their fourth issue, AllTranstek and Rescar challenge the trial court's award of attorney's fees, costs, and expenses, as part of the judgment, in the amount of $8,324,073.25. AllTranstek and Rescar Brief at 68-85. AllTranstek and Rescar contend that to set aside the "American Rule," which precludes a litigant from recovering attorney's fees from an adverse party, the party seeking recovery of attorney's fees must demonstrate, *inter alia*, a clear agreement between the parties to permit such a recovery. *Id.* at 68-69.

AllTranstek and Rescar assert that the trial court's reliance on Section 13.1 of Axiall's Terms and Conditions was misplaced because Section 13.1 related to AllTranstek's and Rescar's obligation to indemnify, defend, and hold harmless Axiall against third-party claims. *Id.* at 73-74. AllTranstek and Rescar argue that "[n]othing in Section 13.1 clearly provides that Axiall may [recover attorney's] fees incurred in Axiall's own lawsuit against the recipient of its [purchase orders, namely AllTranstek and Rescar,] (as opposed to [] lawsuits between Axiall and third-parties)." *Id.* at 75. AllTranstek and Rescar contend,

> The language that Axiall [used in Section 13.1] – especially its framing of the putative obligation as one requiring [AllTranstek and Rescar] to "indemnify, defend[,] and hold harmless Axiall," – does not clearly evince an intent to include first-party claims. Indeed, absent some specific language to the contrary, a statement that [AllTranstek and Rescar] must "indemnify Axiall" against [AllTranstek or Rescar, or] that [AllTranstek and Rescar] must "defend Axiall and hold Axiall harmless" against [AllTranstek and Rescar], is awkward at best. By contrast, the "indemnify, defend[,] hold harmless" formula applies naturally to claims brought against Axiall by third[-]parties.

*Id.* at 77 (original brackets and record citation omitted; formatting modified). Hence, AllTranstek and Rescar assert that Section 13.1 does not evidence a clear agreement to shift attorney's fees incurred as a result of claims between the contracting parties. *Id.* at 80.

It is well-established that "[u]nder the American Rule, applicable in Pennsylvania, a litigant cannot recover counsel fees from an adverse party unless there is express statutory authorization, a clear agreement of the parties, or some other established exception." ***Trizechahn Gateway LLC v.***

***Titus***, 976 A.2d 474, 482-483 (Pa. 2009). In the case *sub judice*, we are concerned with whether there was a clear agreement between the parties to award attorney's fees. ***See Riverview Carpet & Flooring, Inc. v. Presbyterian SeniorCare***, 299 A.3d 937, 984 (Pa. Super. 2023) (stating, the party seeking an award of attorney's fees must demonstrate that the parties reached a clear agreement to set aside the American Rule).

The American Rule derives from a federal congressional act passed in 1853, which was designed to curb the losing party from being unfairly saddled with exorbitant fees for the prevailing party's attorney. ***See Alyeska Pipeline Serv. Co v. Wilderness Soc'y***, 421 U.S. 240, 251 (1975). We recognize, as did the New York Court of Appeals, recently, that "[t]he American Rule is intended to increase free access to the courts for those who would otherwise be discouraged from seeking judicial redress of wrongs for fear of having to pay a defendant's attorney's fees." ***See Sage Systems, Inc. v. Liss***, 198 N.E.3d 768, 770 (N.Y. 2022); ***see also Riverview Carpet***, 299 A.3d at 983 (stating, "a primary purpose of contractual fee-shifting clauses is to discourage litigation by creating an incentive for the parties to satisfy their contractual obligations and to think twice before filing long-shot claims or contesting valid claims" (citation and original quotation marks omitted)). We are similarly persuaded, based upon the historical nature and purpose of the American Rule, that promises to pay attorney's fees in first-party claims runs against the grain of the American Rule. ***See Nova Rsch., Inc. v. Penski Truck Leasing Co.***, 752 A.2d 275, 285, 287 (M.D.

2008) (noting that, the recovery of attorney's fees relating to third-party claims is already a great expansion of the exceptions to the American Rule). To broadly interpret clauses within a contract as permitting the recovery of attorney's fees pertaining to first-party claims without an unmistakably clear agreement between the parties would create an exception to the American Rule that would effectively "gut" 170 years of American jurisprudence.

At issue here is Section 13.1 of Axiall's Terms and Conditions, which states as follows:

**13. <u>INDEMNIFICATION</u>**.

13.1  Seller assumes the risk of all damage, loss, costs[,] and expenses, and agrees to indemnify, defend[,] and hold harmless Buyer, its officers, employees[,] and representatives, from and against any and all damages, claims, demands, expenses (including reasonable attorney's fees), losses[,] or liabilities of any nature whatsoever, and whether involving injury or damage to any person (including employees of Seller and Buyer) or property, and any and all suits, causes of action[,] and proceedings thereon arising from or related to the subject matter of this Purchase Order, except where such injury or damage was caused by the sole negligence of Buyer.  This indemnity shall survive the termination or cancellation of this Purchase Order, or any part hereof.

Exhibit 1062 (Terms and Conditions) at §13.1.

Because the question presented in the case *sub judice* involves the interpretation of a contract, our standard of review is *de novo* and our scope of review is plenary.  **McMullen v. Kutz**, 985 A.2d 769, 773 (Pa. 2009).  "The ultimate goal of interpreting a contract is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written

agreement." ***Cnty. of Delaware v. J.P. Mascaro & Sons, Inc.***, 830 A.2d 587, 591 (Pa. Super. 2003), *aff'd*, 873 A.2d 1285 (Pa. 2005). "The intent of the parties to a written agreement is to be regarded as being embodied in the writing itself." ***Murphy v. Duquesne Univ. of the Holy Ghost***, 777 A.2d 418, 429 (Pa. 2001).

"Indemnity agreements are to be narrowly interpreted in light of the parties' intentions as evidenced by the entire contract." ***Consol. Rail Corp. v. Delaware River Port Auth.***, 880 A.2d 628, 632 (Pa. Super. 2005), *appeal denied*, 898 A.2d 1071 (Pa. 2006). "The language of a contract is unambiguous if we can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends." ***Riverview Carpet***, 299 A.3d at 983. Conversely, "the terms of a contract are ambiguous if the terms are reasonably or fairly susceptible of different constructions and are capable of being understood in more than one sense." ***Id.*** at 984. If the meaning of a contract is ambiguous or reasonably susceptible of two interpretations, then the contract must be construed most strongly against the party who drafted it. ***Pittsburgh Steel Co. v. Patterson-Emerson-Comstock, Inc.***, 171 A.2d 185, 189 (Pa. 1961). "A contract contains an ambiguity if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." ***Murphy***, 777 A.2d at 430 (citation and original quotation marks omitted). "In the absence of an ambiguity, the plain meaning of the agreement will be enforced." ***Id.*** (citation omitted).

In the case *sub judice*, the trial court, in awarding attorney's fees, relied upon Section 13.1 of Axiall's Terms and Conditions, finding that this section was clear and unambiguous and applied to first-party claims. Trial Court Opinion, 12/21/22, at 20. The trial court explained,

> Section 13.1 provides that [AllTranstek and Rescar] shall "assume the risk of all damages, loss, cost and expense" and "any and all suits . . . arising from or related to the subject matter of this Purchase Order" in addition to "agreeing to indemnify, defend[,] and hold harmless" Axiall. The inclusion of this broad language placing these risks on [AllTranstek and Rescar] makes it clear that Section 13.1 is not merely an indemnity clause, but a fee-shifting provision that would apply to first-party claims as well as third-party claims.
>
> Additionally, Section 13.1 contains much broader and sweeping language when specifying the scope of claims and expenses against which Axiall is to be indemnified. . . . Section 13.1 unambiguously provides for indemnity against "**any and all** claims, . . . expenses (including reasonable [attorney's] fees) . . . **of any nature whatsoever** . . . ." (emphasis added). Short of inserting the magic words "first-party claims," it is hard to imagine more inclusive contractual language that would evince a clear agreement of the parties to pay attorney['s] fees in connection with first-party claims.
>
> . . .
>
> Section 13.1 of Axiall's Terms and Conditions contains additional clauses that cannot be read superfluously.
>
> . . .
>
> Section 13.1 does not contain merely the words "indemnify" "defend" and "hold harmless," but further provides that [AllTranstek and Rescar] assume the risk of all damages and costs, and of any and all suits, arising from the contract. Thus, in order to give effect to each provision of the contract, [the trial court] reads Section 13.1 to apply to first-party claims.

*Id.* at 18-19 (original brackets omitted).

Upon review, we are unable to agree with the trial court that the language contained in Section 13.1 of Axiall's Terms and Conditions is clear and unambiguous. **See id.** at 20; **see also Riverview Carpet**, 299 A.3d at 983. As Section 13.1 reads, AllTranstek and Rescar "assume[] the risk of all damage, loss, costs[,] and **expenses**" and "agree[] to indemnify, defend[,] and hold harmless [Axiall], its officers, employees[,] and representatives, from and against any and all damages, claims, demands, **expenses (including reasonable attorney's fees)**, losses[,] or liabilities of any nature whatsoever[.]" Exhibit 1062 at §13.1 (emphasis added). The plain language of Section 13.1 asks vendors, such as AllTranstek and Rescar, to assume the risk of damages, losses, costs, and expenses arising from work performed under Axiall's purchase orders. In addition, Section 13.1 asks vendors to indemnify Axiall for claims, demands, and damages asserted by third-parties, including reasonable attorney's fees incurred in defense of such claims.

In the absence of express terms stating that vendors agree to indemnify Axiall for attorney's fees incurred in the affirmative pursuit of first-party recoveries for losses, damages, or costs assumed by its own vendors or other contractual partners, we cannot find a clear agreement between the parties to create a fee-shifting provision pertaining to first-party claims that validly displaces the American Rule. We will not broadly interpret the term "expenses" in the assumption of risk clause to include recovery of attorney's fees incurred in the affirmative enforcement of Axiall's rights against its vendors absent unmistakable textual clarity in the parties' agreement. **See**

***Pittsburgh Steel***, 171 A.2d at 189 (stating, there can be no presumption that the parties intended a fee-shifting provision absent clearly expressed or unequivocal language so indicating); ***see also Unit Vending Corp. v. Lacas***, 190 A.2d 298, 300 (Pa. 1963) (stating, "in determining the intention of the parties, the writing must be construed most strongly against the party drafting it and the interpretation which makes a rational and probable agreement must be preferred"); ***McMullen***, 985 A.2d at 771 (finding, as way of example, that a clear agreement for a fee-shifting provision existed where the parties' contract stated that "the party breaching this contract **shall be responsible for payment of legal fees** and costs incurred by the other in enforcing their rights under this Agreement").

Consequently, the trial court erred as a matter of law in reaching its conclusion that Section 13.1 created a fee-shifting provision that permitted Axiall to recover attorney's fees related to all first-party claims. We do agree, however, that the indemnification clause of Section 13.1 does permit Axiall to recovery reasonable attorney's fees, if any, associated with its defense and settlement, of third-party claims, which stemmed from AllTranstek's and Rescar's breach of contract, breach of warranty, and negligence. As such, we are constrained to vacate the portion of the judgment that awarded attorney's fees in the amount of $8,324,073.25. We remand this case to the trial court

to determine which portion of attorney's fees, if any, directly related to the defense and settlement of third-party claims.[30]

**AXIALL CROSS-APPEAL**

On cross-appeal, Axiall raises the following issues for our review:

> 1. Whether the trial court erred by denying Axiall's motion *in limine* to exclude testimony of [AllTranstek's and Rescar's] expert[] and all of Axiall's subsequent objections at trial requesting that [the expert's] testimony be excluded where his testimony consisted primarily of conclusions of law that exceed the scope of permitted expert testimony and failed to meet the basic requirement of [Pennsylvania Rule of Evidence] 702 that the expert's knowledge must assist the trier[-]of[-]fact in understanding the evidence or determining a fact in issue, and by admitting such evidence[?]
>
> 2. Whether the trial court erred by denying Axiall's motion *in limine* to exclude evidence related to non-normalized steel, [ACF200] stub sill[ underframes], [Axiall's] remedial

---

[30] A review of the record demonstrates a summary of net attorney's fees as follows: Meyer, Unkovic & Scott, LLP invoiced $3,505,543.00; Porter Hedger LLP invoiced $2,288,191.67; Steptoe & Johnson invoiced $172,074.35; Thompson Hine invoiced $451,304.00; Bracewell LLP invoiced $67,590.00; and Berry, Kessler, Crutchfield, Taylor & Gordon invoiced $14,865.00. Meyer, Unkovic & Scott, LLP were retained to work with Porter Hedger LLP "to basically develop the case and to try it." N.T., 7/20/22, at 109. Porter Hedger LLP was retained to work with Meyer, Unkovic & Scott, LLP as the trial team and Attorney Whalen, from Porter Hedger LLP, was told he would serve as lead counsel. N.T., 7/21/22, at 175. Steptoe and Johnson, as well as Thompson Hines, were retained primarily to handle third-party claims. N.T., 7/20/22, at 24. Bracewell LLP was retained as an "expert in appellate records." N.T., 7/21/22, at 264. Berry, Kessler, Crutchfield, Taylor & Gordon were retained to assist Steptoe & Johnson "in dealing with local people." *Id.* at 264.

It is unclear from the trial court's opinion which portions of the attorney's fees award related to the defense and settlement of third-party claims.

actions, and post-rupture changes to regulations and industry guidance, and all of Axiall's subsequent objections at trial requesting that such evidence be excluded, including, but not limited to, Axiall's objections to the presentation of any defense expert testimony regarding non-normalized steel and [ACF200] stub sill [underframes], and by admitting such evidence[?]

Axiall Cross-Appeal Brief, at 6-7 (extraneous capitalization omitted).

On cross-appeal, Axiall challenges the trial court's denial of its motions *in limine* to exclude expert witness testimony and certain evidence related to, *inter alia*, non-normalized steel and remedial actions. Axiall Cross-Appeal Brief at 6. On September 9, 2020, Axiall filed a motion *in limine* seeking to exclude the testimony of AllTranstek's and Rescar's expert witness, Joseph Connelly,[31] on the basis that his testimony "consists primarily of conclusions of law that exceed the scope of permitted expert testimony[.]" Axiall Motion *In Limine* to Exclude Testimony, 9/9/20, at ¶2. In particular, Axiall asserted that the interpretation of government regulations applicable to the chemical incident involves a question of law and lies within the exclusive providence of the trial court. *Id.* at ¶8. Axiall argues on cross-appeal that the trial court erroneously permitted the testimony of Mr. Connelly pertaining to the interpretation of these regulations, and his expert testimony "led the jury to believe that Axiall was contributorily negligent simply because it owned AXLX 1702." Axiall Cross-Appeal Brief at 20, 22-31.

---

[31] Joseph Connelly was admitted at trial as an expert on railcar regulations and railcar and hazardous material industry standards. N.T., 10/6/21 (Morning Session), at 3587.

In a second motion *in limine*, also filed on September 9, 2020, Axiall sought to exclude evidence related to non-normalized steel, ACF200 stub sill underframes, remedial actions, and post-rupture changes to regulations and industry guidance. Axiall Motion *In Limine* to Exclude Evidence, 9/9/20. In particular, Axiall asserted that evidence of non-normalized steel, ACF200 stub sill underframes, and changes to government regulations and industry guidance was excluded under Pennsylvania Rules of Evidence 402 and 403.[32] *Id.* at ¶1(a) and (c). Axiall further asserted that evidence of remedial actions taken by Axiall after the rupture of railroad tank car AXLX 1702 was excluded under Pennsylvania Rule of Evidence 407.[33] *Id.* at ¶1(b). On cross-appeal, Axiall contends that "the evidence regarding non-normalized steel and ACF200

---

[32] Rule 402 states, "All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible." Pa.R.E. 402. Rule 403 provides that "The [trial] court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403.

[33] Rule 407 states,

> When measures are taken by a party that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible against that party to prove: negligence; culpable conduct; a defect in a product or its design; or a need for a warning or instruction. But the [trial] court may admit this evidence for another purpose such as impeachment or - if disputed - proving ownership, control, or the feasibility of precautionary measures.

Pa.R.E. 407 (formatting modified).

stub sill underframes was irrelevant, unduly prejudicial, confusing, and misleading[, and] the admission of this improper evidence led the jury to find that Axiall was contributorily negligent." Axiall Cross-Appeal Brief at 21, 31-50. Axiall further argues that evidence of changes in regulations, guidance, advisories, or standards after the incident was "irrelevant, unduly prejudicial, confusing, and misleading[, and because] this evidence supported [AllTranstek's and Rescar's] primary defense, its improper admission prejudiced Axiall[.]" *Id.*

Here, Axiall "conditions" the pursuit of its cross-appeal on whether this Court grants relief on AllTranstek's and Rescar's appeal. Axiall Cross-Appeal Brief at 20 (stating, "if this Court grants [AllTranstek and Rescar] the relief sought in their appeal and orders a new trial, Axiall requests that this Court address the issues in this conditional cross-appeal").[34]

Our Supreme Court recently reiterated the well-established principle that appellate courts "will not decide moot questions where there exists no actual case or controversary." *McGuire on behalf of Neidig v. City of Pittsburgh*, 285 A.3d 887, 895 (Pa. 2022), *citing* *Meyer v. Strouse*, 221 A.2d 191 (Pa. 1966). "A question is moot unless it involves a legal controversy that is real and not hypothetical and it affects an individual in a concrete

---

[34] At oral argument, counsel for Axiall conceded that if this Court affirms the judgment entered in favor or Axiall, then Axiall's cross-appeal is moot.

manner so as to provide the factual predicate for a reasoned adjudication."

**McGuire**, 285 A.3d at 895.

In the case *sub judice*, as discussed *supra*, we affirm, in large part, the judgment entered in favor of Axiall in the amount of $14,265,451.46 based upon the jury's determination that AllTranstek and Rescar breached their contracts and warranties with Axiall. By pursuing its cross-appeal at this juncture, Axiall is asking this Court to decide issues which would not affect the affirmation of the judgment in its favor. As such, Axiall's challenges to the trial court's order denying its motions *in limine* are moot. Consequently, we dismiss Axiall's cross-appeal as moot.

## CONCLUSION

In sum, we affirm the judgment, in part, in the amount of $14,265,451.46, which is comprised of the jury verdict in the amount of $12,800,000.00, delay damages in the amount of $403,802.46, and post-judgment interest in the amount of $1,061,649.00. We vacate the judgment, in part, in the amount of $8,324,073.25, which represents the award of attorney's fees, and remand this case for further proceedings consistent with the views expressed in this memorandum. Finally, we dismiss Axiall's cross-appeal as moot.

Judgment affirmed, in part, and vacated, in part. Case remanded. Jurisdiction relinquished. Cross-appeal dismissed as moot.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 6/3/2024